1  Patrick Carey, (Bar No. 308623)
   Mark Todzo, (Bar No. 168389)
2  **LEXINGTON LAW GROUP, LLP**
   503 Divisadero Street
3  San Francisco, California 94105
   Telephone: (415) 913-7800
4  pcarey@lexlawgroup.com
   mtodzo@lexlawgroup.com
5

6  *Attorneys for Plaintiffs and the Proposed Classes*

7  [Additional counsel on signature page.]

8

9              **UNITED STATES DISTRICT COURT**
             **NORTHERN DISTRICT OF CALIFORNIA**
10                   **SAN JOSE DIVISION**

11  A.A., a minor, by and through their guardian       Case No.
    ad Litem DEIDRE BOLIN; A.B., a minor,
12  by and through their guardian ad Litem
    CARESS JOHNSON; A.C., a minor, by and          **CLASS ACTION COMPLAINT**
13  through their guardian ad Litem GREGARY
    JOHNSON; A.D., a minor, by and through
14  their guardian ad Litem TYLER                   DEMAND FOR JURY TRIAL
    LANGSOM; A.E., a minor, by and through
15  their guardian ad Litem KEITH
    STRATTON; A.F., a minor, by and through
16  their guardian ad Litem JACOB
    VANDERSMITTE, individually and on
17  behalf of all others similarly situated,
18
                    Plaintiffs,
19
          v.
20
    ROKU, INC.,
21
                    Defendant.
22

23

24

25

26

27

28

Plaintiffs A.A., a minor, by and through their guardian ad Litem DEIDRE BOLIN; A.B., a minor, by and through their guardian ad Litem CARESS JOHNSON; A.C., a minor, by and through their guardian ad Litem GREGARY JOHNSON; A.D., a minor, by and through their guardian ad Litem TYLER LANGSOM; A.E., a minor, by and through their guardian ad Litem KEITH STRATTON; and A.F., a minor, by and through their guardian ad Litem JACOB VANDERSMITTE ("Plaintiffs"), by and through their counsel, hereby allege the following against Roku, Inc. ("Roku" or "Defendant"), on behalf of themselves and all others similarly situated, based on personal knowledge, information and belief, the investigation of counsel, and public sources.

## INTRODUCTION

1.     This action arises of out of Roku's unfair business practices and invasion of the privacy of millions of American children under the age of 13 in violation of law and societal norms. Specifically, Roku has unlawfully collected personal information of children under 13 to curate content so that it can serve Plaintiffs and the Class behavioral advertising and/or share their information with third parties — all for profit.

2.     Roku claims to have pioneered TV streaming, becoming the leading television streaming platform in the United States, by hours streamed.[1] Roku boasts that its platform is "fast, fun, and easy" and that it offers "user-friendly" streaming, with a single landing page where users can access thousands of apps (referred to by Roku as "channels"), internet content, ad-supported programming, and live television. Roku offers its own content on the Roku Channel as well as third party content from popular content creators like Disney, Netflix, and Hulu.

3.     Users can access Roku from low-cost devices like streaming sticks that connect to their television. Increasingly, users purchase televisions or devices that are pre-integrated with Roku's operating system ("Roku OS"). Roku has broadly licensed Roku OS to major television

---

[1] Roku, Inc., Form 10-K, at page 1 (SEC filed February 14, 2025), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001428439/000142843925000013/roku-20241231.htm#i09cd34beebf4471d9baff8d20668154c_16.

manufacturers such as RCA, Philips, Hisense, and Walmart's Onn brand. As a result, Roku is now used by 90 million streaming households—almost half of broadband households in the United States.[2] Roku's users streamed 35.8 billion hours in the first quarter of 2025, up 5.1 billion hours from the same period the previous year.[3] In the first quarter of 2025, Roku's net revenue was $1.021 billion.[4]

4.    Roku's success has been fueled in large part by its extensive offerings of children's programming. The Roku Channel's "Kids and Family" section to third-party channels like HappyKids and CoComelon. But beneath its marketing of family-friendly content and assurances that it protects user privacy lies a disturbing reality: the company systematically violates children's privacy rights. Through both its proprietary programming and third-party content hosted on its platform, Roku collects, shares, and profits from the personal information of children, including voice recordings, geolocation data, IP addresses, and browsing histories ("Personal Information")— and permits third parties to do the same—all without the parental notice and consent required by law.

5.    These violations are not accidental, but rather a calculated business decision Roku has made to maximize data collection and advertising revenue, evidenced by its refusal to implement safeguards that are standard among its competitors, such as child-specific user profiles, which would hinder its ability to collect and exploit sensitive data. Roku has built its platform to facilitate invasive tracking not only by Roku itself, but also by third-party content providers and advertisers whose presence on the platform boosts Roku's ad revenue.

6.    Roku boasts that it also "enables content publishers to build and monetize large audiences and provides advertisers with unique capabilities to engage consumers."[5] Roku's own

---

[2] *Roku Rings in the New Year with 90 Million Streaming Households*, Roku Newsroom (Jan. 7, 2025), https://newsroom.roku.com/news/2025/01/roku-rings-in-the-new-year-with-90-million-streaming/vqequcxa-1736256134.

[3] *Q1 2025 Key Results*, https://image.roku.com/bWFya2V0aW5n/1Q25-Shareholder-Letter.pdf

[4] *Q1 2025 Key Results*, https://image.roku.com/bWFya2V0aW5n/1Q25-Shareholder-Letter.pdf

[5] Roku, About Us, https://www.roku.com/about/company (accessed June 16, 2025).

statements make clear that its business model is fundamentally driven by third-party partnerships and advertising revenue.

7.    The Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 501, *et seq.,* protects children under 13 years old from having their Personal Information collected by operators of websites or online services directed to children, or operators with actual knowledge that they are collecting Personal Information online from children under 13, unless their parent has first given verifiable consent. Since 2013, persistent identifiers have been included within the definition of "Personal Information" that operators of websites and online services are barred by COPPA from collecting from children under 13 years old without verifiable parental consent.

8.    Despite this, Roku has systematically collected, used, and disclosed to third-parties the Personal Information of children under 13, including Plaintiffs and members of the Class, without the requisite notice or consent. Defendant did so while simultaneously misleading users, including Plaintiffs and members of the Class, concerning its collection of the Personal Information of children under 13, in its privacy disclosures and statements to the public.  At all times herein, Defendant had and continues to have actual knowledge that of its collection and maintenance of the Personal Information of children under 13 in violation of COPPA.

9.    Roku's COPPA violations have not gone unnoticed. The Michigan Attorney General filed a complaint against Roku on April 29, 2025, alleging that Roku wrongfully collects and misuses minors' Personal Information without parental consent in violation of COPPA. *See Dana Nessel, Attorney General of the State of Michigan, ex rel. the People of the State of Michigan v. Roku Inc*., Case 2:25-cv-11221-SJM-CI (E.D. Mich) (the "Michigan AG Action"), at ECF No. 1.

10.    COPPA violations "shall be treated as a violation of a rule defining an unfair … act or practice prescribed under section 18(a)(1)(B) of the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. § 57a(a)(1)(B)." In other words, a violation of COPPA constitutes an unfair trade practice under Section 5 of the FTC Act. 15 U.S.C. § 45(a). Numerous state statutes prohibiting unfair and/or unlawful business practices which are modeled, patterned after, and/or which take interpretive guidance from, the FTC Act (the "Little FTC Acts"), including those enacted by

California, Illinois, Nevada, and New Jersey. Defendant's conduct in violation of COPPA, described herein, independently violates these Little FTC Acts.

11.    Additionally, Defendant's conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710, and constitutes unwarranted invasions of privacy in violation of the common law right to be free from intrusion upon seclusion, as formulated by § 652B of the Restatement (Second) of Torts, recognized by California, Illinois, Nevada, and New Jersey. The California Constitution also provides California citizens and residents with an enumerated right to privacy.

12.    Accordingly, Plaintiffs, through their parents and guardians, bring this action for the relief asserted herein, on behalf of themselves and the Classes of similarly-situated minors whose privacy rights have, like Plaintiff, been violated by Defendant, for damages, restitution, and appropriate injunctive and/or equitable relief, pursuant to (a) the Video Privacy Protection Act, 18 U.S.C. § 2710; (b) the unfair competition laws, or "Little FTC Acts," of California, Illinois, Nevada, and New Jersey; (c) the common law right to be free from intrusion upon seclusion in California, Illinois, Nevada, and New Jersey; and (d) the right to privacy enumerated in the California Constitution, as well as (e) for relief from Defendant's unjust enrichment at the expense of minor children in California, Illinois, Nevada, and New Jersey.

## JURISDICTION AND VENUE

13.    This Court has general personal jurisdiction over Defendant Roku, Inc. because its headquarters and principal place of business are in California. Additionally, Defendant is subject to specific personal jurisdiction in this State because a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in this State.

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C § 1332(d), because the amount in controversy for the Classes exceeds $5,000,000 exclusive of interest and costs, there are more than 100 potential class members, defined below, and minimal diversity exists because the majority of potential class members are citizens of a state different than Defendant.

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

15.    This Court also has jurisdiction pursuant to 28 U.S.C §1332(d), because the amount in controversy exceeds $75,000 and is between citizens of different states.

16.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because a substantial portion of the conduct described in this Complaint was carried out in this District. Furthermore, Defendant is headquartered in this District and subject to personal jurisdiction in this District.

17.    Assignment to the San Jose Division is proper under Northern District of California Civil Local Rule 3-2(c) because a substantial part of the events or omissions which give rise to the claims asserted herein occurred in Santa Clara County and Defendant's principal places of business is located in Santa Clara County, California. Under Civil Local Rule 3-2(e), all civil actions which arise in the County of Santa Clara shall be assigned to the San Jose Division.

**PARTIES**

**I.    Plaintiffs**

18.    Plaintiff AA. is a natural person and is a resident and citizen of the State of Illinois. A.A. was under the age of 13 during the relevant period. A.A.'s parent and legal guardian is Deirdre Bolin, who is also a resident and citizen of the State of Illinois.

19.    Plaintiff A.B. is a natural person and is a resident and citizen of the State of Illinois. A.B. was under the age of 13 during the relevant period. A.B.'s parent and legal guardian is Caress Johnson, who is also a resident and citizen of the State of Illinois.

20.    Plaintiff A.C. is a natural person and is a resident and citizen of the State of California. A.C. was under the age of 13 during the relevant period. A.C.'s parent and legal guardian is Gregary Johnson, who is also a resident and citizen of the State of California.

21.    Plaintiff A.D. is a natural person and is a resident and citizen of the State of New Jersey. A.D. was under the age of 13 during the relevant period. A.D.'s parent and legal guardian is Tyler Langsam, who is also a resident and citizen of the State of New Jersey.

22.    Plaintiff A.E. is a natural person and is a resident and citizen of the State of Nevada. A.E. was under the age of 13 during the relevant period. A.E.'s parent and legal guardian is Keith Stratton, who is also a resident and citizen of the State of Nevada.

23.     Plaintiff A.F. is a natural person and is a resident and citizen of the State of California. A.F. was under the age of 13 during the relevant period. A.F.'s parent and legal guardian is Jacob Vandersmitte, who is also a resident and citizen of the State of California.

**II.     Defendant**

24.     Defendant Roku, Inc. is a business incorporated under the laws of the state of Delaware with its principal place of business in San Jose, California.

## FACTUAL BACKGROUND

**I.     The Roku Platform**

25.     Founded in 2002, Roku has become the top TV streaming platform in the United States. Roku's stated mission is to "be the streaming platform that connects and benefits the entire TV ecosystem around the world" by "connect[ing] users to the streaming content they love," "enabl[ing] content publishers to build and monetize large audiences," and "provid[ing] advertisers with sophisticated tools to reach and engage consumers."[6]

26.     To assist in that mission, Roku has produced a suite of streaming devices powered by Roku's operating system developed specifically for streaming content (Roku OS). Roku OS is the foundation of the Roku platform, connecting viewers to the streaming platform via a broadband network and giving them access to a wide selection of content.[7] It is the licensed Roku OS that provides "customers access to content they want at prices they can afford, while content creators will find new audiences and ways to engage them."[8]

27.     Devices utilizing Roku OS include Roku streaming devices such as streaming sticks that connect to a television to enable consumers to access the Roku platform and televisions

---

[6] About Roku, https://www.roku.com/about/company?srsltid=AfmBOooxBOZO00O1f0cEkSzfDeHabFCDA9igluRQlKj-OjsDRayfvE7B

[7] Roku, Inc., Form 10-K, at page 1 (SEC filed February 14, 2025), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001428439/000142843925000013/roku-20241231.htm#i09cd34beebf4471d9baff8d20668154c_16.

[8] *Our Story,* Roku, https://www.roku.com/about/history-of-roku (accessed June 20, 2025).

manufactured by Roku (Roku TV) with Roku OS built in.[9] Roku maintains low prices for its devices, with its streaming players ranging from $29.99 – $79.99, and its televisions priced starting at $227.[10]

28.    Roku also has broadly licensed Roku OS to major television manufacturers such as RCA, Philips, Hisense, and Walmart's Onn brand, allowing them to leverage Roku's smart TV reference designs to build televisions.[11] As a result, Roku OS is now the number one smart TV operating system in the US.[12]

29.    In addition to TVs, Roku is accessible on computers, tablets, or mobile devices. Furthermore, Roku sells smart home devices such as security cameras, video doorbells, and smart lighting that are integrated with Roku OS and can be accessed from Roku streaming devices.[13]

30.    A device enabled with Roku can access a variety of content on the Roku platform. Specifically, the platform provides access to hundreds of apps or "channels" that can be accessed and downloaded from Roku's "Streaming Store," also referred to as the "Channel Store" or "Roku Store."

31.    Channels on the Streaming Store are sorted into categories such as: Kids & Family, Film & TV, Music & Podcasts, News & Weather, Sports, Comedy, Food & Home, Lifestyle, Educational, Games, Media, International, Faith-Based, and Travel.[14] Some channels offer a cost-free download while earning revenue through ads. Other premium channels, like Disney+, require a paid subscription.

---

[9] *Company*, Roku, https://www.roku.com/about/company.

[10] *Roku Streaming Players*, Roku, https://www.roku.com/products/players; *Smart TVs made by Roku*, https://www.roku.com/products/roku-tv/roku-made-tvs.

[11] Roku, Inc., Form 10-K, at page 1 (SEC filed February 14, 2025), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001428439/000142843925000013/roku-20241231.htm#i09cd34beebf4471d9baff8d20668154c_16.

[12] *Roku, the #1 Selling TV Operating System in the U.S. and Mexico, Celebrates 10 Years of Roku TV*, Roku (Blog), June 3, 2024, https://newsroom.roku.com/news/2024/01/roku-the-1-selling-tv-operating-system-in/auojhl-5-1704293241 (last accessed June 13, 2025).

[13] *Company*, Roku, https://www.roku.com/about/company.

[14] Channelstore.roku.com/browse

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

32.    Roku users can download and access Roku and third-party content at a variety of locations on the Roku platform, including pages entitled "Streaming Store," "Apps," "What to Watch," and "Featured Free."

33.    All Roku users can access "The Roku Channel," a top streaming channel owned and operated by Roku, providing free, ad-supported content, including original programming and live TV. Roku also resells ad-free premium streaming subscriptions through The Roku Channel.[15] The Roku Channel has become one of the most popular streaming services in the United States and is the number two channel on the Roku platform by level of engagement.[16]

34.    In addition to The Roku Channel, Roku provides access to third-party apps or channels. Roku boasts that it has "[a]ll of the top apps . . . in one place."[17] These include, Netflix, Apple TV, Max, Peacock, Hulu, Paramount Plus, Disney Plus, Prime Video, ESPN, and YouTube.

35.    In 2024, Roku added an AI-powered personalized content row to the Roku Home Screen that recommends content from the various channels available on the Roku platform. The purpose of personalized content is two-fold: It "is designed to recommend TV shows and movies to viewers while simultaneously driving growth for Roku in areas such as Streaming Hours . . . and ad reach."[18]

## II.    Roku's Children Programming

36.    Much of the programming on the Roku platform is child-directed. The Roku Channel offers programming for children under the content category "Kids & Family." It is organized into content-specific sub-categories (such as Furry Friends & Big Adventures and Princess Time) and age-specific categories (such as Ages 1–3, Ages 4–6, Ages 7–9, and Ages 10+).

---

[15] Roku 2024 SEC Form 10-K at 3 (identifying the sale of premium subscriptions as one source of platform revenue).

[16] *Q1 2025 Key Results*, https://image.roku.com/bWFya2V0aW5n/1Q25-Shareholder-Letter.pdf

[17] Roku, https://www.roku.com/what-is-roku (last accessed June 13, 2025).

[18] Roku, Inc., Form 10-K, at page 3 (SEC filed February 14, 2025), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001428439/000142843925000013/roku-20241231.htm#i09cd34beebf4471d9baff8d20668154c_16.

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

37.     Roku advertises its Kids & Family channel category as containing more than 10,000 free kids' shows and movies with colorful landing pages displaying available content.



38.     Intensifying the lure of the The Roku Channel, much of the Kids & Family content is sourced from popular children's television shows and movies, as well as children's YouTube channels, such as *Ryan's World* and *Like Nastya*. These YouTube channels draw in large children audiences—and in turn, draw in large audiences to The Roku Channel.

39.     *Ryan's World,* one of the top ten most-viewed YouTube channels in the United States, features child YouTube celebrity Ryan Kaji, famous for his toy unboxings. *Like Nastya* is similarly among the top ten most-viewed YouTube channels in the world and features 11-year-old Russian YouTube celebrity Anastasia Radzinskaya, whose content includes children's songs and toy unboxings.

40.     Kids & Family also features *CoComelon*, the second most viewed YouTube channel in the world, an animated program with songs and nursery rhymes targeted to children ages 1–3 years old—as well popular content like Bob the Builder, Barney, Baby Shark, Lego, Garfield, and Barbie.

41.     While users can access children's content on The Roku Channel by navigating to the content category "Kids & Family," users can also access children's content directly from Roku's other platform pages. For instance, the Roku platform's Home Screen, Search page, Featured Free page, and What to Watch page all present users with direct links to children's content from Kids and Family on The Roku Channel.

42.     Roku also aggregates its content into sections it calls "Roku Zones," which are shown on its content pages and populate content based on programming related general search terms. Roku has multiple Roku Zones specific to children's content. For example, a search for "kid" on The Roku Channel will result in Roku Zones titled "Nursery Rhymes" and "Based on Books." These children-focused Roku Zones provide curated selections of children's programming and games, displayed on playful, animated backgrounds.

43.     As a result, Roku's extensive child-directed programming and content is accessible from all parts of its streaming platform.

44.     In addition to The Roku Channel, the Roku platform provides access to child-directed programming from third-party channels, some of which is available on Roku's own channel. This content is often labeled with child-friendly descriptions and vibrant visuals. For Example:

    a.  Blippi, which is "designed for preschoolers and kindergarteners[.]"



b. PBS Kids, to "[w]atch all your child's favorite PBS KIDS shows anytime, anywhere[.]"



c. Baby Einstein, to expand "your baby's view of the world."



d. HappyKids – Kids TV, which offers "safe streaming for children of all ages!" of movies and shows like Cocomelon, Pokémon, Sesame Street, Blippi, Paw Patrol, Peppa Pig, LEGO, K-city Gaming, and more."

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

1

2

3

4

5

6

7

8



9

10    e.   HappyKids Girls, which offers "Hours of FREE, SAFE, FUN, and

11        EDUCATIONAL videos for girls," and games "carefully chosen to be fun and

12        safe for girls, with no bad language or scary stuff!"

13

14

15



16

17

18

19

20

21

22

23

24

25

26

27

28

f.  Kids Tube, which is YouTube Kids for Roku users, catering to age groups 4 and under, ages 5-8, and ages 9-12.



g.  Ryan and Friends, which offers "a vibrant mix of popular kids' shows," including content for "little learners."

h.  LooLoo Kids – Nursery Rhymes, "the place where kids find all their favorite nursery rhymes and songs with lyrics" with "the best quality edutainment for babies, toddlers and kids!"

i.  Paw Patrol & Friends, "the perfect show for young adventurers."

j.  GoNoodle, offering engaging content designed for kids aged 4-10.

k.  Ninja Kidz TV, which is aimed at kids aged 6 and up.

l.  Stunt Racer, a child-directed cartoon racing game.

m.  The Wiggles, with "all types of content for preschoolers!"

45.    Like Roku's own child-directed content, third-party child-directed content is available in the Kids & Family section and on the main Roku platform pages, including the Home Screen, Search page, Featured Free page, and What to Watch page.

46.    Roku pins downloaded channels, including children's channels, to the Roku Home Screen—ensuring that children are frequently encouraged to access third-party content.

47.    In fact, the Roku platform itself is inherently child-directed and designed to draw in child users. When the Roku platform is idle, Roku displays the "Roku City" screensaver—an animated design with recurring animated characters that appeals to children. Roku advertises "Roku City" as a "fan-favorite screensaver featuring hidden TV and movie references" which has "evolved into an even more engaging platform."[19]

48.    One generic example of Roku City is depicted below, with an alien spaceship, Ferris wheel, boat, planes, and gorilla.



---

[19] https://advertising.roku.com/learn/resources/2024-recap-technology-and-creativity-on-roku

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

49.     More recently, screensavers depict popular children's characters. In May 2023, for example, a Paramount+ screensaver on Roku City depicted popular children's characters Blue's Clues and Peppa Pig in the building windows,[20] as shown below:



---

[20] *Paramount+ Launches a Custom Roku City Neighborhood,* Roku Newsroom (May 24, 2023), https://newsroom.roku.com/news/2023/05/paramount-launches-a-custom-roku-city-neighborhood/gt5m-yux-1684931100

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

50.    As another example, in December 2023, the Roku City screensaver showed the Disney Castle—a family-friendly vacation destination—to celebrate Disney's 100th anniversary, with a design clearly appealing to children:[21]



[21] https://www.hollywoodreporter.com/business/digital/disney-world-castle-roku-city-screensaver-takeover-1235761671/

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

51.     Finally, in July 2024, Roku City designed to appeal to children through the Paramount+ SpongeBob-themed screensaver, shown below.[22] As mentioned above, SpongeBob was one of the top 5 searches on Roku in 2024, making the Roku City advertisement a clear success



### III.     Roku's Collection and Disclosure of Personal Information of Children Under 13

52.     Roku does not have a separate data collection policy for minor children. Rather, Roku applies its data collection practices to each user who visits the Roku platform on any Roku-enabled device or website, regardless of that user's age.  Roku applies its standard data collection even for users who view exclusively children's content on Roku, despite the fact that knows that audience for that content is children under the age of 13.

53.     Unlike its competitors, Roku does not offer user profiles, or separate profiles for child users.  Many of Roku's competitors allow this option to enable parents to identify when a child is using the service, moderate what content is accessible, and prevent or consent to the collection of that child's personal information. Because Roku does not offer a similar option, it collects Personal

---

[22] https://www.hollywoodreporter.com/business/business-news/paramount-spongebob-squarepants-campaign-roku-1235944008/

Information from all users of its platform by default without first determining whether the users it is collecting that Personal Information from are children under the age of 13.

54.     By declining to implement children's profiles, Roku ensures that it does not limit its widespread collection of children's personal information when they use Roku. This maximizes the data Roku collects from its users by ensuring that Roku's most invasive data collection practices affect children on its platform just as much as they affect adults.

55.     Roku collects users' Personal Information from essentially all interactions with Roku—including Roku content and platform pages, third-party streaming services on a Roku-enabled device, content on smart TVs with Roku's OS installed (via "Automatic Content Recognition," which identifies content displayed on the TV screen even outside the Roku platform), and "websites, apps, streaming services, and connected devices (including Smart TVs and mobile devices) to which Roku provides advertising or measurement and analytics services."[23]

56.     The Personal Information Roku acknowledges it collects includes:

    a.  "Identifiers, including, device identifiers, internet protocol addresses, browser cookies, and other unique online identifiers";

    b.  "Account registration information" including "name, address" and "telephone number";

    c.  "Commercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies";

    d.  "Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a consumer's interaction with an Internet website, application, or advertisement";

    e.  "Precise geolocation"; and

---

[23] Roku, User Privacy Policy, https://docs.roku.com/published/userprivacypolicy.

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

f. "Audio" and "visual" information from users.[24]

57.    Roku collects and uses this Personal Information to, *inter alia*, provide targeted advertisements to users. For example, with respect to information from Cookies and Similar Technologies, Roku and its "business partners, such as analytics and advertising partners, collect information about [users'] online activities over time and across different online services," using "cookies, pixel tags, web beacons, SDK, device identifiers or similar technologies to recognize [users] when [they] use Roku Services, and to collect information such as the number of visits, which features and pages are popular, and to measure [user] browsing activities" to, among other things "provide, personalize, and measure advertisements."[25]

58.    Indeed, for many of the above categories, Roku admittedly discloses the Personal Information to third parties for a "business purpose," including to the following: service providers and vendors; app and content providers; advertisers, ad networks and advertising partners; advertising measurement providers; third party platforms and devices used to access the Roku Services; voice assistant providers; Roku's affiliates; other users of Roku; and merchants and their partners users transact with on Roku.[26]

59.    And Roku even shares or sells certain categories of this Personal Information with third parties for "Cross-Context Behavioral Advertising," including to: advertisers, ad networks, advertising partners, and ad measurement providers; app providers, where the app is installed on the Roku Device, and content providers from whom users purchase or subscribe to content; and third party platforms and devices users use to access the Roku Services.[27]

60.    Thus, the collection of Personal Information comes from the direct collection of users' Personal Information, browsing data, and voice recordings; tracking users with Roku's own cookies and persistent identifiers; and partnerships with third-party analytics companies and data

---

[24] Roku, User Privacy Policy, https://docs.roku.com/published/userprivacypolicy.

[25] *Id.*

[26] *Id.*

[27] *Id.*

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

brokers to record users' viewing habits, to track users across the internet, and even to track users' physical locations as they move about their day.

**A. Roku's Collection of the Personal Information of Children Under 13**

61.    Roku collects Personal Information from children when they access content from any child-directed sections of the Roku platform other than Kids and Family on The Roku Channel, as well as when they access certain third-party children's content that Roku knows to be child-directed.

62.    Even more troubling, Roku also collects Personal Information from children when they view content within Kids and Family on The Roku Channel. Roku's collection of user data from viewers of content from Kids and Family on The Roku Channel is particularly troubling because Roku promised parents it would not collect this information. For example, when launching Kids and Family on The Roku Channel, Roku misrepresents that it would collect only "non-user level data" from viewers.[28] Yet, Roku collects user-level data from these viewers, uses it for targeted ads, and then discloses that user-level data to data brokers and other third parties.

63.    The Mozilla Foundation—a global nonprofit dedicated to keeping the Internet a public resource that is open and accessible to all—describes Roku as "the nosy, gossipy neighbor of connected devices," explaining that Roku tracks "just about everything [it] can" and "share[s] the data with lots and lots of advertisers, channel providers, business affiliates, and more.[29] The Mozilla Foundation  gave Roku its "Privacy Not Included" warning, a label it reserves for products it has "determined to have the most problems when it comes to protecting [users'] privacy and security."[30]

---

[28] Sarah Perez, "Roku launches a Kids & Family section on The Roku Channel, plus parental controls" (Aug. 19, 2019), https://techcrunch.com/2019/08/19/roku-launches-a-kids-family-section-on-the-roku-channel-plus-parental-controls/.

[29] Mozilla Foundation, "Roku Streaming Sticks" (Nov. 9, 2022), https://foundation.mozilla.org/en/privacynotincluded/roku-streaming-sticks/.

[30] *Id.*

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

64.    Similarly, Common Sense Media—an independent nonprofit seeking to build a digital world where kids can thrive—gave Roku its "Warning" label, specifically giving it 20% ("Poor") ratings on the issues of "Data Security" and "Parental Consent."[31]

**B. Roku's Collection of Children's Personal Information from Third Parties**

65.    Roku collects children's Personal Information not only from Roku channels but also from the third-party channels and services that utilize its Roku platform.[32]

66.    A 2022 Pixalate study[33] examining 350 child-directed channels available on the Roku platform confirmed:

    a.    *Nearly all* (96%) of those 350 child-directed channels collected precise geolocation information, sufficient to identify the street name and city or town of the user, and disclosed that information to outside advertisers in the process of delivering programmatic advertisements to the child viewers of these channels.

    b.    *Nearly all* (90%) of those 350 child-directed channels collected and disclosed the residential IP address of children viewing the channels in the process of delivering programmatic advertisements.

    c.    *All* (100%) of those 350 child-directed channels collected and disclosed either precise geolocation information or residential IP addresses of their child viewers in the process of delivering programmatic advertisements.

67.    Even more concerning, a study of Roku by Princeton and University of Chicago technology researchers determined that Roku's "Kids & Family" programming actually collected and disclosed children's Personal information to third-party advertising exchanges at a *higher rate*, and to more third-party domains, than programming in other categories.[34]

---

[31] Common Sense Privacy Program, "Privacy Evaluation for Roku" (Mar. 22, 2023), https://privacy.commonsense.org/evaluation/Roku.

[32] Roku, User Privacy Policy, https://docs.roku.com/published/userprivacypolicy.

[33] Pixalate, "CTV Apps: Roku vs. Amazon COPPA Risk Scorecard" (2022).

[34] Moghaddam et al., "Watching You Watch: The Tracking Ecosystem of Over-the-Top TV Streaming Devices," 2019 ACM SIGSAC Conference on Computer and Communications Security (2019).

68.     Specifically, the study found more than 40 separate trackers contacted by the game "Rock Paper Scissors Free," which was the 437th most popular channel on Roku at the time. "Rock Paper Scissors Free" remains on Roku's Channel Store today, and the game states in its privacy policy that it collects personal information including IP addresses, uses cookies to track players across the internet, shares users' personal information with third-party ad servers, and uses this information to serve users targeted advertisements.[35] Many of the games in Roku's "Games" category, like "Rock Paper Scissors Free," are included in the "Kids & Family" section of Roku's Channel Store—making it likely that a substantial number of its players are children under 13.

69.     Roku knows that these third-party channels collect the Personal Information of children under 13 without parental notice or consent in violation of COPPA. Third-party channel pages in the Kids & Family section of Roku's Channel Store frequently link to privacy policies that state they collect and disclose the Personal Information of users, including location information and IP addresses, when they view the channels, and like Roku, those third-parties do not distinguish between the Personal Information of adults and children.

70.     For example, the Kids & Family section of Roku's Channel Store includes the channel "Mini Movies," which contains " a treasure trove of heartwarming tales that entertain, educate, and inspire children."[36] The privacy policy linked on the Mini Movies Roku page states that the channel "may collect . . . Internet Protocol (IP) address" from users, and that it uses "cookies and similar technologies" to track users,[37] but like Roku, it includes no provisions for protecting children's Personal Information.

71.     Indeed, popular child-directed third-party channels on Roku—"HappyKids," "Ninja Kidz TV," and "HappyKids Girls"—share a privacy policy that states: "Do we collect Personal

---

[35] Roku, Roku Channel Store, Rock Paper Scissors Free, https://channelstore.roku.com/en-gb/details/123cfe930b6c0a77b33fc4fbbca57805/rock-paper-scissors-free; StuffWeLike, Privacy Policy, http://www.stuffwelike.com/privacy-policy/

[36] Roku, Roku Channel Store, Mini Movies, https://channelstore.roku.com/details/acb602aad32ab956af18bc15c14e80b1/mini-movies.

[37] SignalJump, Privacy Policy, https://signal-jump.com/policy.html.

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

Data? YES. Some categories include IP addresses, device and advertising identifiers, first name and last name, usage data and other information obtained with cookies and similar tracking technologies."[38] There appears to be no limit on those channel's collection of children's Personal Information.

72.    Additionally, Google, the owner of YouTube, a channel available in the Roku Channel Store, has been the subject of significant litigation for its violations of COPPA, including, *inter alia,* an action by the FTC and the New York State Office of the Attorney General against Google, complaining of Google's wrongful collection and misuse of minors' Personal Information without parental consent in violation of COPPA.

73.    These third-party channels collect children's Personal Information and Roku knowingly benefits from that collection.

### C. Roku Discloses Children's Personal Information to Third Parties

74.    Roku discloses Personal Information to a variety of third parties.

75.    Specifically, third-party streaming services on the Roku Platform "receive [user's] Roku account registration information . . . and information about [user] interactions with the Roku Services" which "is disclosed for different purposes, including for reporting and analytics, helping [the user] subscribe to apps or access paid content, providing services to [the user], tailoring [the] user experience, customizing [the] searches and discovery, and personalizing ads."[39] Thus, Roku discloses children's Personal Information to these third-party streaming services.

76.    And when Roku's users watch children's programming on The Roku Channel from an internet browser, Roku shares Personal Information about those users (typically children under 13) with web tracking companies such as Google and New Relic. This is evidenced by Roku listing Google and New Relic as among the service providers that it uses to process information about users, identifying Google as providing "Ad Targeting, Analytics/Measurement, [and] Optimization"

---

[38] Future Today, Privacy Summary, https://futuretodayinc.com/privacy (last updated Dec. 18, 2024).

[39] Roku, User Privacy Policy, https://docs.roku.com/published/userprivacypolicy.

for Roku, and New Relic as providing "Analytics/Measurement, Content Customization, [and] Optimization" for Roku—and acknowledging in its privacy policy that it shares "Account registration Information, i.e., name, address, email address," as well as "device identifiers, internet protocol addresses," "other unique online identifiers," and "Precise geolocation" with such "service providers."[40]

77.    In addition, Roku uses, or has used, tracking pixels and cookies from Meta, LinkedIn, and Nextdoor to track its users, including on The Roku Channel. Roku identifies each of these companies as those it uses to collect and process information about users for "Ad Targeting, Analytics/Measurement, [and] Optimization,"[41] and it acknowledges it shares users' names, addresses, email addresses, precise geolocation information, IP addresses, Roku IDs, and other persistent identifiers with such companies.

78.    Finally, Roku shares geolocation information and persistent identifiers for children viewing content available on Kids and Family on the Roku Channel with data brokers such as Nexxen (f/k/a Tremor). Research from the U.S. Public Interest Research Group in 2023 identified Tremor as a notable data broker that grouped Americans in at least 400 different health segments, including "vape users" and users who have an "opioid interest," in order to better "deliver targeted advertising."[42]

### D. Roku Collects the Voice Data of Children Under 13

79.    Roku released its first microphone-equipped remote in 2015. Since then, Roku has invested heavily in voice functionality—adding the feature to its mobile app, remote controls used with its streaming sticks, and all new Roku devices. Roku encourages children to use Roku's voice

---

[40] Roku, "Roku cookie policy for Roku websites," https://privacy.roku.com/info/cookie; Roku, User Privacy Policy, https://docs.roku.com/published/userprivacypolicy.

[41] Roku, "Roku cookie policy for Roku websites," https://privacy.roku.com/info/cookie.

[42] Comments of U.S. Public Interest Research Group, Proposed Amendments to the Health Breach Notification Rule at 3, 16 CFR part 318, Project No. P205405 (Aug. 8, 2023).

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

features, with instructions upon opening Kids and Family on The Roku Channel to "Use your voice!"

80.    In its privacy policy, Roku acknowledges that it collects "audio information when [users] use voice-enabled features."[43]

81.    Roku not only uses the voice recordings it collects to improve its own targeted advertising and develop its products, but it also admitted to disclosing the voice recordings to third parties. As Roku's privacy policy explains, it uses customers' "[a]udio" information to, among other things, "improve and enhance the Roku Services (including building correlations for use in Roku's advertising services in order to better serve our advertisers), and to develop new products, services, features and functionality."[44]

82.    Roku goes on to acknowledge that it shares its customers' audio data with "[channel] and content providers," "[v]oice assistant providers," and "[s]ervice providers and vendors."[45]

83.    Additionally, Roku Director of Product Management Lloyd Klarke said in 2015 that Roku used an undisclosed third-party partner to help it process customers' voice commands.[46]

84.    As a result, it is Roku's practice that when children under 13 use voice features outside Kids and Family on The Roku Channel or third-party content identified to Roku as directed to children—and even when children under 13 are viewing content that Roku treats as directed to children—Roku collects and discloses children's voice recordings to one or more third-parties for processing.

85.    Roku also collects users' sensitive personal information via voice commands. According to Roku, its users "can use their Roku voice remote or mobile app to audibly enter their

---

[43] Roku, User Privacy Policy, https://docs.roku.com/published/userprivacypolicy.

[44] *Id.*

[45] *Id.*

[46] VentureBeat, "Roku adds voice recognition and improves its search capabilities" (Apr. 6, 2015), https://venturebeat.com/mobile/roku-adds-voice-recognition-and-improves-its-search-capabilities/.

credentials" in order to purchase or use a third-party streaming app, including their "email, password, street address, PIN, and method of payment."[47]

86.     Roku retains voice recordings from customers' use of these features—including children under 13—by default. In its privacy policy, it offers customers the ability to "disable Roku's retention of voice recordings captured on your remote control or mobile device."[48]

## IV.    Roku's Collection and Disclosure of Personal Information Drives Its Advertising Model

87.     Roku's advertising is essential to its business model, accounting for the majority (86%) of its revenue,[49] and its advertising, in turn, is built on collecting and tracking user data. Its position in wearing multiple hats as the manufacturer of streaming devices, the operator of its streaming Roku OS, and the provider of its own channel places Roku in a uniquely manipulative position to track and collect the Personal Information of its users, including children under 13, and target those users with advertisements.[50]

88.     Advertising methods employed by Roku include direct and programmatic video advertisements, audience development for streaming services, brand sponsorships, and advertisements integrated into Roku's user interface.[51] Its advertisement measurement framework consists of a "verified identity" based in direct relationships with users that is then combined with advertisers' preferred data sources.[52]

---

[47] Roku, Roku Developers, "Roku Voice overview," https://developer.roku.com/en-gb/docs/features/voice/overview.md.

[48] Roku, User Privacy Policy, https://docs.roku.com/published/userprivacypolicy.

[49] Adam Levy, *People Think Roku Makes Money Selling Streaming Sticks and SmartTVs, but 86% of Its Revenue Comes From Something Else Entirely*, The Motley Fool (Jan. 16, 2024), https://www.fool.com/investing/2024/01/16/people-think-roku-makes-money-selling-streaming-st/.

[50] *See* Roku 2024 SEC Form 10-K at 3 ("The display ads we offer are integrated into the Roku Experience and are only possible because we are the streaming platform.").

[51] Adam Levy, *People Think Roku Makes Money Selling Streaming Sticks and SmartTVs, but 86% of Its Revenue Comes From Something Else Entirely*, The Motley Fool (Jan. 16, 2024), https://www.fool.com/investing/2024/01/16/people-think-roku-makes-money-selling-streaming-st/; Roku 2024 SEC Form 10-K at 3.

[52] Roku 2024 SEC Form 10-K at 4.

89.    Roku even offers channels the ability to work with Roku staff to develop tailored advertising campaigns for the channels. In Roku's own words:

> The quickest and easiest way to get started promoting your [channel] on our platform is our [Roku Ad Manager] tool. This tool enables publishers to purchase display ads for their [channel] on Roku's home screen UI. . . . Publishers with larger advertising budgets can also engage our Audience Development team. This team consists of campaign managers who use a more advanced toolset, and can help develop an on- and off-device advertising campaign that is tailored to your engagement goals on the platform.[53]

90.    Because of the personalized content that Roku shows to users based on usage habits, Roku accounts that typically view children's programming on Kids and Family on The Roku Channel or third-party child-directed channels are targeted with advertisements and suggestions for other children's programming from the moment they open their accounts—including on the Roku Home and Search screens.

91.    Even if children are only viewing content from within Kids and Family on The Roku Channel, they still receive targeted advertisements because Roku collects Personal Information while children view content within Kids and Family on The Roku Channel and uses that Personal Information to serve children targeted advertisements for Roku content and third-party paid content for which Roku receives a share of revenue.[54]

92.    Behavioral targeting is the delivery of advertisements to individuals based on that user's personal information, which is tracked across multiple websites, apps, and devices. Because the advertising relies on Personal Information collected from child users over time, the advertising is "behavioral advertising," which includes results in ads for paid programming on Roku, from

---

[53] Roku, Roku Developers, "Video advertisements," https://developer.roku.com/en-gb/docs/features/monetization/video-advertisements.md.

[54] Roku generally retains 20% of net revenue from any "Transaction channel" that "monetizes through subscriptions or in-app purchases." Roku, Roku Developers, "Monetization overview,"https://developer.roku.com/docs/features/monetization/monetization-overview.md.

which Roku earns a share of revenue, and third-party programming that Roku monetizes by serving some or all of the advertising displayed.

93.     Roku facilitates and controls over the delivery of advertising on third-party channels, including child-directed channels. Third-party channels on Roku are built using Roku's proprietary software development kit (SDK). Roku requires channel owners to register for the Roku developer program, and it then provides step-by-step instructions for how to use Roku tools to develop a Roku channel and run advertising on the channel. The "Roku Advertising Framework" (RAF) is a library built into the Roku SDK that connects third-party channels to third-party ad servers. Roku advertises that its RAF library is meant to handle the burden of managing advertisements for third-party channel developers: "The RAF library is intended to allow developers to focus their effort on the core design of their applications, and provide them with the ability to quickly and easily integrate video advertising features with minimal impact to the rest of their application."[55]

94.     Roku's advertising on third-party channels is two-fold. First, under the "Inventory Split" model, Roku has the right to sell up to 30% of the advertising inventory on third-party channels, with Roku keeping 100% of revenue from those sales. Publishers are then permitted to sell the remaining 70% of their advertising inventory and keep 100% of that revenue. Roku purports to conduct "content appropriateness reviews" before serving advertising on third-party channels operating under the Inventory Split model.[56] Second, Roku retains the right to enroll large, lucrative publishers in the "Roku Sales Representation Program." This involves Roku taking over and managing 100% of the channel's advertising inventory and then sending back to the channels a share of the revenue.[57] Roku thus generally serves targeted, programmatic advertising using user data across third-party channels on its platform. Roku controls third-party channels' advertising in other

---

[55] Roku, Roku Developers, "Integrating the Roku Advertising Framework," https://developer.roku.com/en-gb/docs/developer-program/advertising/integrating-roku-advertising-framework.md.

[56] *Video advertisements*, Roku Developers, https://developer.roku.com/docs/features/monetization/video-advertisements.md.

[57] *Video advertisements*, Roku Developers, https://developer.roku.com/docs/features/monetization/video-advertisements.md.

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

ways as well. For instance, Roku enters into agreements with third-party channels that permit Roku to fill unsold advertising inventory on those channels.

95.    The result of the foregoing is that any time a third-party channel fails to identify its content as directed to children, both Roku and the third-party channel benefit from the delivery of more lucrative ads.

96.    Roku also manages its advertisement and data collection success through its Measurement Partner Program, which Roku describes as featuring companies that have been "evaluated and vetted" by Roku, including for "their compliance with consumer privacy policies."[58]

97.    Roku promotes the availability of these measurement partners as a valuable part of working with Roku. For instance, on a page dedicated to advertising on Roku and describing "[h]ow it works," Roku emphasizes the ability to use "trusted measurement providers" on Roku in order to "[m]easure impact and gather insights."[59]

98.    Roku's Measurement Partner Program provides publishers and advertisers the tools to "measure outcomes across the marketing funnel, including reach, resonance, and reaction." "Reach" refers to identifying whom specifically "the campaign reach[ed]." "Resonance" refers to how "the audience resonate[d] with the campaign branding and message." And, perhaps most significantly, "reaction" refers to whether the campaign "ultimately dr[o]ve consumers to react via a purchase, store visit, or website visit."

99.    Among Roku's Measurement providers is Kochava, a data broker. According to the FTC, "Kochava sells data that directly links [mobile advertising IDs] to individual consumers' identifying information" and enables its customers to "learn sensitive information about individual consumers who are identifiable without inference or additional steps."[60] Kochava provides its

---

[58] Roku, Roku Advertising, "Roku Measurement Partner Program," https://advertising.roku.com/advertiser-solutions/roku-partners. Roku has revised this webpage, but as of February 2024 it read, "Roku's measurement program partners are evaluated and vetted based on factors such as . . . their compliance with consumer privacy policies."

[59] Roku, Roku Advertising, "How it works," https://advertising.roku.com/en-gb/getting-started/how-it-works.

[60] Second Am. Compl. ¶ 17, FTC v. Kochava Inc., No. 22-cv-377 (D. Idaho July 15, 2024).

customers with access to "precise geolocation data" for consumers, as well as "comprehensive profiles of individual consumers," which include a user's "name, email address, and home address."[61]

100.    The way that Kochava works is that it tracks individual personal devices throughout the day and links those personal devices to a specific household by tracking where those devices are located at night. In the context of Roku, because personal devices are linked to a household's Roku account, Kochava can track Roku user's (including children's) to see what ads appear on the Roku platform for their individual devices.

101.    Using Kochava's data, a Roku advertiser can better determine when a user who saw a given ad made a purchase as a result of seeing that ad. Kochava's integration with the Roku OS and third-party Roku channels enables the company to collect, monetize, and disclose to third parties the personal information of Roku users, including children under 13. The fact that Kochava collects the Personal Information of children under 13 is confirmed by the fact that it boasts its ability identify "consumers' sensitive characteristics," including "status as a minor."[62]

102.    Roku benefits from Kochava's data collection because Kochava increases the value of advertising on the Roku platform, thereby increasing Roku's advertising revenue and making its platform more attractive to content providers and advertisers alike.

103.    In order to maximize its own profit, Roku ignores the child-directed nature of its platform as a whole and of specific aspects of its platform and does not have any policies or safeguards in place to ensure children's data is not exploited in violation of COPPA.

## V.    The Children's Online Privacy Protection Act of 1998

104.    In response to concerns that children's online activities were being tracked by operators of websites and online services, Congress passed COPPA, codified at 15 U.S.C. § 6501, *et seq.*, in 1998. COPPA is intended to "maintain the security of personally identifiable information

---

[61] *Id.* ¶¶ 25-26.

[62] Second Am. Compl. ¶ 52, FTC v. Kochava Inc., No. 22-cv-377 (D. Idaho July 15, 2024).

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

of children collected online" and to "protect children's privacy by limiting the collection of personal information from children without parental consent."[63] The standards in COPPA have given rise to, and correlate with, accepted norms throughout society for defining the expectations of privacy for minor children.

105.     COPPA applies to any operator of a commercial website or online service directed to children under 13 years old that collects, uses, and/or discloses Personal Information from children. The FTC considers parties with actual knowledge that they are collecting Personal Information from users of a child-directed site or service as "operators" under COPPA.

106.     COPPA "prohibits unfair . . . acts or practices in connection with the collection, use, and/or disclosure of personal information from and about children on the Internet." 16 C.F.R. § 312.1.

107.     COPPA provides, in pertinent part, that:

It is unlawful for an operator of a website or online service directed to children, or any operator that has actual knowledge that it is collecting personal information from a child, to collect personal information from a child in a manner that violates the regulations prescribed [by the Federal Trade Commission].

15 U.S.C. § 6502(a).

108.     COPPA thus prohibits, *inter alia*, the collection of persistent identifiers for behavioral advertising, absent notice and verifiable parental consent. 16 C.F.R. §§ 312.5(c)(7), 312.2.

109.     COPPA specifically requires an "operator" covered by COPPA to give notice to parents and obtain their verifiable consent before collecting children's Personal Information online. 16 C.F.R. §§ 312.4 and 312.5. This includes but is not limited to:

a.  Posting a privacy policy on its website or online service providing clear, understandable, and complete notice of its information practices, including what information the website operator collects from children online, how it uses such

---

[63] 144 CONG. REC. S12787.

information, its disclosure practices for such information, and other specific disclosures set forth by COPPA;

b. Providing clear, understandable, and complete notice of its information practices, including specific disclosures directly to parents; and

c. Obtaining verifiable parental consent prior to collecting, using, and/or disclosing Personal Information from children.

110. Websites or online services that collect Personal Information from users of other child-directed websites or online services are deemed as "child-directed" if the website or online service "has actual knowledge that it is collecting personal information directly from users of another Web site or online service directed to children." 16 C.F.R. § 312.2.

111. To determine whether a website or online service is "directed to children" the FTC will:

> [C]onsider [the website's or online service's] subject matter, visual content, use of animated characters or child-oriented activities and incentives, music or other audio content, age of models, presence of child celebrities or celebrities who appeal to children, language or other characteristics of the Web site or online service, as well as whether advertising promoting or appearing on the Web site or online service is directed to children.

16 CFR § 312.2.

112. In 2013, COPPA was enhanced (the "2013 COPPA Enhancement") to provide greater protection for children against online tracking and to "giv[e] parents greater control over the online collection of their children's personal information." The 2013 enhancement widened the definition of children's "Personal Information" to include "persistent identifiers" such as cookies that track a child's activity online, geolocation information, photos, videos, and audio recordings. Section 312.2 of COPPA Rule, 16 C.F.R. § 312.2

113. Specifically, the COPPA Enhancement defines "Personal Information" to include:

a. a first and last name;

b.  a home or other physical address including street name and name of

c.  a city or town;

d.  online contact information as defined in this section;

e.  a screen or user name where it functions in the same manner as online contact information, as defined in this section;

f.  a telephone number;

g.  a Social Security number;

h.  a persistent identifier that can be used to recognize a user over time and across different Web sites or online services. Such persistent identifier includes, but is not limited to, a customer number held in a cookie, an Internet Protocol (IP) address, a processor or device serial number, or unique device identifier;

i.  a photograph, video, or audio file where such file contains a child's image or voice;

j.  geolocation information sufficient to identify street name and name of a city or town; or

k.  information concerning the child or the parents of that child that the operator collects online from the child and combines with an identifier described in this definition."

114.    The 2013 COPPA Enhancement was the culmination of two years of rulemaking by the FTC and reflected society's growing recognition of the surreptitious surveillance tactics used by advertising companies to track children online and advertise to them while using the internet.

115.    For example, the FTC published a 2012 report entitled *Mobile Apps for Kids: Disclosures Still Not Making the Grade* (the "FTC Kids Mobile App Report") addressing privacy dangers for children using mobile devices with persistent identifiers to access the internet. The FTC Kids Mobile App Report warned that companies link persistent identifiers and geolocation data they collect with additional Personal Information such as name, address, and email address—allowing those entities and their partners to identify individual users whom they profile with indisputably individual specificity.

116.    By expressly including persistent identifiers and geolocation data in COPPA's definition of Personal Information, the FTC intended to deter advertising companies and advertising network operators, such as Roku, from exploiting young children via tracking, profiling, and advertising online.

117.    It is also a violation of COPPA for operators such as Roku to collect and retain children's voice recordings. In 2017, the FTC issued an Enforcement Policy Statement regarding the collection and retention of voice recordings under COPPA, acknowledging that the collection of voice recordings by the operator of an online service directed to children constitutes a "collection" of personal information that violates COPPA. 82 Fed. Reg. 58076.

118.    Specifically, an operator would be subject to COPPA enforcement if it did not "provide clear notice of its collection and use of the audio files and its deletion policy in its privacy policy," and if the operator made "any other use of the audio file in the brief period before the file is destroyed—for example, for behavioral targeting or profiling purposes, for identification purposes through voice recognition, or for posting, selling, or otherwise sharing the file with third parties." *Id*. at 58076-77.

119.    Pursuant to Section 1303(c) of COPPA, 15 U.S.C. § 6502(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of COPPA constitutes an unfair . . . act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

120.    While COPPA does not itself provide a private right of action for individuals to seek redress for harms arising from COPPA violations, and contains a limited preemption clause barring the imposition of liability by states and local governments "inconsistent" with COPPA (15 U.S.C. § 6502(d)), the United States Court of Appeals for the Ninth Circuit has held that "COPPA's preemption clause does not bar state-law causes of action that are parallel to, or proscribe the same conduct forbidden by, COPPA." *Jones v. Google LLC*, 73 F.4th 636 (9th Cir. 2023).

121.    Therefore, individuals harmed by conduct which violates COPPA such as the conduct described herein may seek redress for harms via state law causes of action.

122.    State legislatures across the country have enacted consumer protection statutes proscribing the same unfair and unlawful business conduct proscribed by the FTC Act and rules promulgated thereunder. These "Little FTC Acts" were often enacted for the specific purpose of supplementing the FTC's mission of protecting consumers from unfair and/or unlawful acts or practices by providing state citizens with a private right of action to seek redress for harm arising out of acts those acts which are also prohibited by the FTC Act, which lacks a private right of action.

## SUBSTANTIVE ALLEGATIONS

### I.    Roku Had Actual Knowledge of its Child Users and Child-Directed Content

123.    Roku has actual knowledge that a significant portion of its users are children. In 2023, Roku published an advertising article examining its audience demographics in which it focused on the value of members of Generation Z.[64] Generation Z is defined as those born between 1997–2012,[65] which means that in 2023, younger members of Generation Z were *under* 13 years old. Roku stated that it was the number one device and television OS for Generation Z.[66]

124.    Moreover, in 2024, the "most-searched franchises" on Roku were (1) Inside Out; (2) SpongeBob SquarePants; (3) Bluey; (4) Yellowstone; and (5) The Super Mario Bros. Movie.[67] Four of that top five are children's programming.

125.    Moreover, Roku has historically marketed itself as a free service for children, while publicly acknowledging children's agency in how they use Roku. For example, below are quotations from a series of press releases and posts on the Roku Blog that highlight Roku's offerings of child-directed content:

---

[64] *Understanding Roku's audience: Scale, demographics, and streaming trends*, Roku Advertising (April 25, 2023) ("Gen Z, in particular, is very receptive to advertising compared to other generations, especially when there is a clear value exchange, such as watching ads to access free content.").

[65] Michael Dimock, *Defining generations: Where Millennials end and Generation Z begins*, Pew Research Center (Jan. 17, 2019), https://www.pewresearch.org/short-reads/2019/01/17/where-millennials-end-and-generation-z-begins/.

[66] *Understanding Roku's audience: Scale, demographics, and streaming trends*, Roku Advertising (April 25, 2023).

[67] *2024 recap: Technology and creativity on Roku,* Roku Advertising (Dec. 17, 2024), https://advertising.roku.com/learn/resources/2024-recap-technology-and-creativity-on-roku.

a. A press release announcing an agreement between WildBrain and Roku to bring more children's shows to the Roku Channel stated, "We're delighted to be expanding our slate of animated and live-action kids' shows for The Roku Channel's audience in the U.S. . . . Kids and Family on The Roku Channel strives to bring families the best of kids' entertainment for free . . . We're thrilled to work with our great partners at WildBrain to bring families even more exclusive programming featuring beloved characters and stories to stream on The Roku Channel."[68]

b. In a press release announcing Roku's deal with Pocket.watch to bring five exclusive titles to The Roku Channel's Kids & Family, Roku stated, "Pocket.watch, the leading kids and family studio creating global franchises for Generation Alpha, announces it has signed a new deal with The Roku Channel Kids & Family, a leading kids ad-supported video on demand (AVOD) streaming service that makes it easy for parents and their children to discover and enjoy great family-friendly content. In Q4 2022, *The Roku Channel Kids & Family was streamed by more households than any standalone kids and family AVOD app on the Roku platform*."[69]

c. "Do your little ones want to watch the same TV show again and again? If your kids' viewing habits are anything like mine, these 12 free Roku channels will be a welcome change to the same free movies or shows over, and over, and over . . . [.] Did we miss any of your children's favorite Roku channels?"[70]

d. "Are your kiddos out of school this week? All those fun outdoor Spring Break activities are sure to tire them out . . . and will absolutely tire you out. So, for those

---

[68] *WildBrain Lands Multiple Kids' Series on The Roku Channel*, Roku Newsroom (Aug. 10, 2023), https://newsroom.roku.com/en-gb/news/2023/08/wildbrain-lands-multiple-kids-series-on-the-roku-channel/ysg-affd-1691682895.

[69] *Roku Strikes Deal with pocket.watch to Bring Five Exclusive Titles to The Roku Channel Kids & Family*, Roku Newsroom (Feb. 13, 2023), https://newsroom.roku.com/en-gb/news/2023/02/roku-strikes-deal-with-pocket-watch-to-bring-five-exclusive/eeju0mob-1676296599 (emphasis added).

[70] Bill Wilson, Roku Blog, *12 free kids Roku channels* (March 5, 2018), https://www.roku.com/blog/free-kids-roku-channels.

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

much needed breaks on the couch – the free Roku channels on your Roku player or Roku TV to the rescue!"[71]

e. "All your preschoolers' favorite entertaining and educational TV shows are here! Today the popular NOGGIN service is available on Roku players and Roku TV models in the U.S."[72]

126.    Roku has expressly acknowledged in filings with the SEC for the past three consecutive years that: "[T]here is political or regulatory pressure in some countries to limit streaming TV advertising (including limiting the advertising that may be associated with children's content) . . . *which could pose a threat to our operating results and our ability to grow our business*."[73]

127.    Roku's child-directed activities have also been confirmed by studies, such as a 2022 study by Pixalate, privacy analytics firm, which analyzed the advertising practices of child-directed channels on Roku, determined that approximately 350 channels on Roku are "child-directed."[74]

## II.    Roku Violated COPPA

128.    Roku is an "operator" under COPPA because it is an "online service" that "collects or maintains personal information from or about the users of . . . [the] online service." 16 C.F.R. § 312.2.

129.    Roku also constitutes an "operator" under COPPA with respect to third-party channels because those channels collect personal information on Roku's behalf, as Roku "benefits by allowing [those third-party channels] to collect personal information directly from users" of its online service. *Id.*

---

[71] Melissa Morell, Roku Blog, *The top free Roku channels for kids* (Mar. 24, 2016), https://www.roku.com/blog/top-free-roku-channels-kids.

[72] VP Ed Lee, Roku Blog, *NOGGIN now streaming on the Roku platform* (Nov. 2, 2016), https://www.roku.com/blog/noggin-now-available-on-the-roku-platform.

[73] *See* Roku 2024 SEC Form 10-K at 16 (emphasis added); s*ee also* Roku 2023 SEC Form 10-K at 17; Roku 2022 SEC Form 10-K at 17.

[74] Pixalate, "CTV Apps: Roku vs. Amazon COPPA Risk Scorecard" (2022).

130.     Roku is an "online service directed to children" within the meaning of COPPA by its provision and distribution of child-directed content in the Roku platform. *Id.*

131.     Specifically, The Roku Channel and particular Roku platform pages, including Roku's Home page, Search page, Featured Free page, and What to Watch page are "directed to children," as are Roku's "Kids and Family on The Roku Channel" section, the "Kids & Family" and "Games" sections of Roku's Channel Store, Roku Zones, and other child-directed content sections such as "Animated Adventures" and "Popular Free Kids Movies and TV Shows," as well as the channels and content in each these sections. *Id.*

132.     Roku and the channels and content within are by definition "directed to children" because they use, *inter alia*, "visual content" that is targeted to children, "animated characters," "child-oriented activities," "child celebrities," "celebrities who appeal to children," and "advertising . . . directed to children." *Id.*

133.     Additionally, statements by Roku also show that it is generally an "online service directed to children," as Roku employees and executives frequently discuss and promote Roku as a service made for children, including children who watch programming without a parent present, and Roku marketing uses images depicting children watching programming without a parent present.

134.     Accordingly, Defendant is subject to COPPA—a fact that it does not dispute. Indeed, Roku admits that its "business activities may be within the scope of existing or proposed laws and regulations intended to protect minors online" including "the Children's Online Privacy Protection Act," and states' incorporation of children's privacy requirements into their laws."[75]

135.     At all relevant times herein, Roku knew that the unfair and unlawful tactics it employed to bait, steer, and lure children to Roku were successful in drawing millions of American children to use its platform. And Roku knowingly tracked, collected, and used their Personal Information both directly and through third-party channels.

---

[75] SEC Form 10K (year ending 2024) at 34.

136.    Roku collects the Personal Information of children who use the Roku platform generally, The Roku Channel, the Roku Home page, Search page, Featured Free page, and What to Watch page, the "Kids and Family on The Roku Channel" section, the "Kids & Family" and "Games" sections of the Roku Channel Store, and other child-directed content sections of the Roku platform such as Roku Zones, "Animated Adventures," and "Popular Free Kids Movies and TV Shows," as well as the channels and content in those sections.

137.    Roku at all times has and had "actual knowledge that it is collecting personal information directly from users of another Web site or online service directed to children" because Roku knows that the child-directed sections and channels—including the "Kids & Family" and "Games" sections of its Streaming Store, "Kids and Family on The Roku Channel," and other child-directed sections of the Roku platform such as "Animated Adventures" and "Popular Free Kids Movies and TV Shows"—are directed to children.

138.    Third-party channels in the "Kids & Family" and "Games" sections of Roku's Channel Store, and third-party channels in other child-directed sections of the Roku platform such as "Animated Adventures" and "Popular Free Kids Movies and TV Shows," collect the Personal Information of children on Roku's behalf.

139.    This collection of children's personal information by Roku and third-party channels on Roku's behalf includes "[p]assive tracking of a child online," "[e]nabling a child to make personal information publicly available in identifiable form," and "[r]equesting, prompting, or encouraging a child to submit personal information online." 16 C.F.R. § 312.2.

140.    The "personal information" includes persistent identifiers such as cookies, IP addresses, device serial numbers, and unique device identifiers; geolocation information sufficient to identify children's "street name and name of a city or town"; files containing a child's voice; and "[i]nformation concerning the child or the parents of that child that the operator collects online from the child and combines with an identifier." *Id.*

141.    Roku also directly and through third parties collected and retained voice recordings from children under 13 from portions of its service that are directed to children, by sharing voice

recordings of viewers of Kids and Family on The Roku Channel (and third-party channels identified as child-directed) with a third-party data processor, and by failing to provide clear notice in its privacy policy of its collection, use, and deletion policy with respect to children's voice recordings. 16 C.F.R. § 312.2.

142.    In fact, Roku maximizes its collection of children's voice data through its "Voice Remote Pro," a remote that is always listening by default, and is set to respond to the user's command upon hearing the phrase "Hey Roku." As a result, like with Apple's Siri, Roku collects users' voice data even when users have not said "Hey Roku" or otherwise intentionally interacted with Roku's voice-activated controls.

143.    Finally, third-party analytics companies and data brokers, including Kochava, Google, New Relic, Meta, LinkedIn, Nextdoor, and Innovid, which collect the "personal information" of children on Roku's behalf because they are agents or service providers for Roku and because Roku benefits by allowing them to collect the personal information.

144.    Roku collects, retains, and uses the Personal Information, including voice recordings, of children under the age of 13, including Plaintiffs and members of the Class.

145.    Roku does not "[p]rovide notice" of "what information it collects from children, how it uses such information, and its disclosure practices for such information" or "[o]btain verifiable parental consent prior to any collection, use, and/or disclosure of personal information from children." 16 C.F.R. § 312.3.

146.    Roku also does not "[p]rovide a reasonable means for a parent to review the personal information collected from a child and to refuse to permit its further use or maintenance." *Id.*

147.    Nor did Roku have any apparent reasonable procedures in place to protect the confidentiality, security, and integrity of Personal Information of Plaintiffs and members of the Class that it improperly collected and used—as Roku shared the information with third-parties. *Id.*

148.    To the contrary, Roku misrepresents its practices with respect to its collection of children's data. First, Roku misrepresents its data-collection practices on Kids and Family on The Roku Channel. Despite saying it would collect only "non-user level data" from viewers of Kids and

Family on The Roku Channel, Roku collects user-level, personal information, including information collected through persistent identifiers.[76]

149.    Roku's privacy policy also falsely and misleadingly denies knowledge that the company collects, processes, or sells the personal information of children. The company claims, "Roku does not have actual knowledge that it sells Personal Information or shares for cross-context behavioral advertising the Personal Information of consumers under 16 years of age."[77]

150.    Although Roku claims it "does not have actual knowledge that it processes the Personal Information of consumers under 13 years of age,"[78] that cannot be true—as Roku markets a wide variety of children's content that is available on its platform and then it collects, processes, and discloses children's Personal Information when they view that content on the Roku platform.

151.    Indeed, Roku relies on third-party partners to enhance its data collection from users, Roku uses third-party cookies to "collect information automatically" from its users, including children under 13.[79]

152.    Thus, when Roku users watch programming—including children's programming—on The Roku Channel from an internet browser, Roku shares Personal Information about those users with web tracking companies such as Google and New Relic.

153.    As a result of the foregoing, Roku misleads parents into believing their children's Personal Information is secure when it is not.

**III.    Roku Engaged in Unfair or Deceptive Acts in Connection with Its Collection, Use, and/or Disclosure of Children's Personal Information.**

154.    At all relevant times herein, Defendant engaged in a concerted effort through its unfair and deceptive acts to lure millions of children under the age of 13—including Plaintiffs and

---

[76] Sarah Perez, *Roku launches a Kids & Family section on The Roku Channel, plus parental controls* (Aug. 19, 2019), https://techcrunch.com/2019/08/19/roku-launches-a-kids-family-section-on-the-roku-channel-plus-parental-controls/.

[77] Roku, User Privacy Policy, https://docs.roku.com/published/userprivacypolicy.

[78] *Id.*

[79] Roku, "Roku Cookies Policy for Roku Websites," https://docs.roku.com/published/cookiepolicy/en/us.

members of the Class—to use Roku so that it could collect their Personal Information, track them across the internet, and show them advertisements in violation of COPPA. Defendant did so with actual knowledge and without first obtaining verifiable parental consent or notice of the Personal Information it was collecting—and without providing parents with reasonable means to review the Personal Information collected from Plaintiffs and members of the Class or refuse to permit its further use or maintenance.

155.    The conduct in violation of COPPA, as described above, not only constitutes "unfair" or "deceptive" and therefore unlawful acts that violate COPPA and the FTC Act, but also constitutes "unfair" or "deceptive" and therefore unlawful acts pursuant to the Little FTC Acts enacted by many states.

156.    Specifically, the acts carried out by Defendant described above constitute "unfair" acts under the Little FTC Acts pursuant to which Plaintiffs bring claims because they: (1) caused substantial injury to Plaintiffs and those similarly situated by intrusively and invasively collecting their Personal Information without parental consent in violation of COPPA, the FTC Act, and societal norms; and (2) attempted to (and often did) manipulate the behavior of Plaintiffs and the millions of similarly situated American children by collecting their Personal Information without parental consent and using that illegally-collected Personal Information for Defendant's own financial benefit.

157.    These injuries were not reasonably avoided by the vulnerable children under 13 years of age that Defendant—a sophisticated corporation—targeted. Nor were the injuries to Plaintiffs and similarly situated American children caused by Defendant outweighed by countervailing benefits to consumers.

**IV.    Roku's Tracking, Profiling, Targeting and Exploitation of Children Without Parental Consent Violated Reasonable Expectations of Privacy and is Highly Offensive**

158.    Roku's conduct in violating privacy rights and reasonable expectations of privacy of Plaintiffs and Class members is particularly egregious because it violated societal norms and laws

designed to protect a group – children – that society has long recognized as vulnerable to exploitation and manipulation.

159.    Parents' interest in the care, custody, and control of their children is one of the most fundamental liberty interests recognized by society. It has long been recognized that parents should maintain control over who interacts with their children and how.

160.    Because children are more susceptible to exploitation than adults, society has recognized the importance of providing added legal protections for children, often in the form of parental consent requirements.

161.    In fact, as discussed above, the FTC's enhancements of COPPA in 2013 reflect the specific concern with mobile app tracking and tracking internet users via persistent identifiers, and reflect the offensiveness with which society regards this behavior.

162.    More than three-quarters (77%) of parents are concerned about protecting their family's digital privacy.[80]

163.    That concern includes data collection, with 73% of parents concerned about personal data being collected by third parties, without their consent.[81]

164.    Parents also recognize the importance of protecting their children's identity (90%) and information such as location (88%), health data (87%), age (85%), school records (85%), and browsing history (84%).[82]

165.    Additionally, as further evidence of Class Members' reasonable expectations with respect to children's privacy, a survey conducted by the Center for Digital Democracy ("CDD") and Common Sense Media of more than 2,000 adults found overwhelming support for the basic principles of privacy embedded in the California Constitution, state common law, as well as federal

---

[80] *Polling Memo: Parents' View on Children's Digital Privacy and Safety,* TRUSTED FUTURE (last accessed June 13, 2025), https://trustedfuture.org/childrens-digital-privacy-and-safety.

[81] *Id.*

[82] *Id.*

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

law.[83] The parents who were polled responded as follows when asked whether they agreed or disagreed with the following statements:

a. "It is okay for advertisers to track and keep a record of a child's behavior online if they give the child free content."

- 5 percent strongly agree
- 3 percent somewhat agree
- 15 percent somewhat disagree
- **75 percent strongly disagree**
- 3 percent do not know or refused to answer

b. "As long as advertisers don't know a child's name and address, it is okay for them to collect and use information about the child's activity online."

- 3 percent strongly agree
- 17 percent somewhat agree
- 10 percent somewhat disagree
- **69 percent strongly disagree**
- 1 percent do not know or refused to answer

c. "There is a federal law that says that online sites and companies need to ask parents' permission before they collect Personal Information from children under age 13. Do you think the law is a good idea or a bad idea?"

- **93 percent said it was a good idea**
- 6 percent said it was a bad idea
- 1 percent did not know or refused to answer

---

[83] Center for Digital Democracy, *Survey on Children and Online Privacy, Summary of Methods and Findings*, https://democraticmedia.org/assets/resources/COPPA-Executive-Summary-and-Findings-1635879421.pdf (last accessed June 13, 2025).

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

166.    The proliferation of internet-connected device usage by children under 13, such as streaming services like Roku, coupled with the concerns express by parents, renders Defendant's conduct highly offensive and an egregious breach of social norms.

167.    Defendant exploited children under 13 for financial gain by luring them with child-directed content and manipulating them into remaining engaged with Roku to the detriment of their mental health, so that they could earn advertising revenue.

168.    Defendant benefitted from increased Roku usage. The longer and more often a child uses Roku, the more data Defendant can exfiltrate and the more advertisements can be shown the child.

169.    By failing to (i) obtain parental consent, (ii) disclose to parents the nature and purpose of their data collection practices (and use of that data), and (iii) take other steps to preclude the capture of children's Personal Information, and by manipulating and exploiting the habits of minors for their economic gain, Defendant has breached the privacy rights and reasonable expectations of privacy of Plaintiffs' minor children and the millions of minors in the Classes who have used Roku, in contravention of privacy norms that are reflected in consumer surveys, centuries of common law, state and federal statutes, legislative commentaries, industry standards and guidelines, and scholarly literature.

**V.    Economic Incentives Propelled Roku to Exploit and Unlawfully Track Children**

170.    Roku consistently manufactures devices at a loss. As a result, it must make up for that loss with through revenue from advertising that is generated by users, among other things, "navigating through the Roku Experience, watching ad-supported content, or signing up for subscription services."[84] In fact, Roku "generate[s] platform revenue *primarily* from the sale of digital advertising (including direct and programmatic video advertising, ads integrated into our UI, and related services)."[85]

---

[84] SEC Form 10-K 2024 at 3.

[85] Roku 2024 SEC Form 10-K at 3 (emphasis added).

171.    Over the twelve-month period that ended in September 2023, Roku sold $471 million worth of streaming devices that cost it $538 million to manufacture.[86] In the same period, Roku generated $2.9 billion in revenue.

172.    In the first quarter of 2025, Roku's device revenue resulted in a gross profit loss of $19.3 million, while its platform revenue (which includes advertising) resulted in a gross profit of $464.3 million.[87]

173.    Any threat to that advertising revenue stream from regulations around, among other things, advertising associated with children's content that may turn advertisers away from streaming platforms, will negatively impact Roku, "[i]f advertisers continue to devote a substantial portion of their advertising budgets . . . on other digital platforms rather than on advertising on our streaming platform, the future growth of our business may be negatively impacted."[88]

174.    Notably, in 2023 Roku admitted that it profited of each of is users, including children.[89] As a result, Roku profits from creating and promoting child-directed content to lure in children users and profit off of each child user. Roku thus had and continues to have an economic incentive to track the Personal Information of its children users and target advertisements to those users under the age 13.

175.    As discussed above, Roku used behavioral targeting to show children under the age 13 advertisements that were uniquely tailored to them for Roku's financial gain.

176.    Targeting advertisements to children adds more value than targeting to adults because children are generally unable to distinguish between content and advertisements. This is especially true in the digital realm, where children are less likely to identify and counteract the persuasive

---

[86] Adam Levy, *People Think Roku Makes Money Selling Streaming Sticks and SmartTVs, but 86% of Its Revenue Comes From Something Else Entirely*, The Motley Fool (Jan. 16, 2024), https://www.fool.com/investing/2024/01/16/people-think-roku-makes-money-selling-streaming-st/.

[87] *Q1 2025 Key Results*, https://image.roku.com/bWFya2V0aW5n/1Q25-Shareholder-Letter.pdf

[88] Roku 2024 SEC Form 10-K at 3 (emphasis added).

[89] Adam Levy, *People Think Roku Makes Money Selling Streaming Sticks and SmartTVs, but 86% of Its Revenue Comes From Something Else Entirely*, The Motley Fool (Jan. 16, 2024), https://www.fool.com/investing/2024/01/16/people-think-roku-makes-money-selling-streaming-st/.

intent of advertising. This results in children, especially those under the age of eight, accepting advertising information in commercials "uncritically . . . [and as] truthful, accurate, and unbiased."[90]

177.    Faced with a choice between complying with federal and state privacy laws and its advertising revenue, Roku chose the money. This self-serving exploitation and manipulation of children for Roku's own profit in constitutes unfair, and unconscionable conduct, and was an egregious invasion of privacy.

**VI.    Plaintiffs and The Members of The Classes have Suffered Economic Loss and Injury as a Result of Defendant's Conduct**

178.    The information that Roku collects and uses had, and continues to have, massive economic value. This value is well understood in the e-commerce industry, and Personal Information is now viewed as a form of currency.

179.    Research on the market for Personal Information dates back decades,[91] before the development of streaming services like Roku, and demonstrates a growing consensus that consumers' sensitive and valuable Personal Information would become the new frontier of financial exploit.

180.    For example, in the early 2000s, Professor Paul M. Schwartz noted in the Harvard Law Review:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.[92]

---

[90] Report of the APA Task Force on Advertising and Children (American Psychological Association, Feb. 20, 2004), at pp.7-8, available at https://www.apa.org/pi/families/resources/advertising-children.pdf (accessed August 9, 2024).

[91] "Markets and Privacy" by Kenneth C Laudon, Communications of the ACM, 1996. https://canvas.harvard.edu/files/4164376/download?download_frd=1.

[92] Paul M. Schwartz, Property, *Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056–57 (2004).

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

181.   Likewise, in a 2011 publication of the The Wall Street Journal, former fellow at the Open Society Institute (and current principal technologist at the ACLU) Christopher Soghoian noted:

> The dirty secret of the Web is that the "free" content and services that consumers enjoy come with a hidden price: their own private data. Many of the major online advertising companies are not interested in the data that we knowingly and willingly share. Instead, these parasitic firms covertly track our web-browsing activities, search behavior and geolocation information. Once collected, this mountain of data is analyzed to build digital dossiers on millions of consumers, in some cases identifying us by name, gender, age as well as the medical conditions and political issues we have researched online. [93]

182.   As the thirst has grown for Personal Information,[94] it has become apparent that the world's most valuable resource is no longer oil, but instead consumers' data in the form of their Personal Information.[95]

183.   The cash value of the Personal Information unlawfully collected by Roku during the Class Period can be quantified. For example, in a study authored by Tim Morey, researchers studied the value that 180 internet users placed on keeping personal data secure.[96] Contact information of

---

[93] Julia Angwin, *How Much Should People Worry About the Loss of Online Privacy?*, THE WALL STREET JOURNAL (Nov. 15, 2011).

[94] *Exploring the Economic of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Paper No. 220 at 7 (Apr. 2, 2013), http://dx.doi.org/10.1787/5k486qtxldmqen; *Supporting Investment in Knowledge Capital, Growth and Innovation*, OECD, at 319 (Oct. 13, 2013), https://www.oecd.org/sti/inno/newsourcesofgrowthknowledge-basedcapital.htm; Pauline Glickman and Nicolas Glady*, What's the Value of Your Data?* TechCrunch (Oct. 13, 2015). https://techcrunch.com/2015/ 10/13/whats-the-value-of-your-data/; Paul Lewis and Paul Hilder, *Former Cambridge Analytica exec says she wants lies to stop*, The Guardian (March 23, 2018) https://www.theguardian.com/uk-news/2018/mar/ 23/former-cambridge-analytica-executive-brittanykaiser-wants-to-stop-lies; Shoshanna Zuboff, *The Age of Surveillance Capitalism 166* (2019).

[95] *The world's most valuable resource is no longer oil, but data*, The Economist (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-nolonger-oil-but-data.

[96] Tim Morey*, What's Your Personal Data Worth?* DESIGN MIND (Jan. 18, 2011), https://web.archive.org/web/20131206000037/http://designmind.frogdesign.com/blog/what039s-yourpersonal-data-worth.html.

the sort that Roku requires was valued by the study participants at approximately $4.20 per year. Demographic information was valued at approximately $3.00 per year. However, web browsing histories were valued at a much higher rate: $52.00 per year. The chart below summarizes the findings:



184.    Similarly, the study *Your Browsing Behavior for a Big Mac: Economics of Personal Information Online* by Juan Pablo Carrascal and colleagues employed a detailed methodology to understand how users their Personal Information in exchange for internet-based services.[97] Participants installed a browser plugin that logged their web browsing activities, including the URLs visited and the time of access.[98] The plugin also categorized the websites into eight predefined categories: Email, Entertainment, Finance, News, Search, Shopping, Social, and Health and asked participants questions designed to gather information about their perceptions of privacy, their knowledge of how their Personal Information might be monetized, and their valuation of specific

---

[97] Juan Pablo Carrascal et al., *Your Browsing Behavior for a Big Mac: Economics of Personal Information Online*, arXiv preprint arXiv:1112.6098 (2011), https://arxiv.org/abs/1112.6098.

[98] Juan Pablo Carrascal et al., *Your Browsing Behavior for a Big Mac: Economics of Personal Information Online*, arXiv preprint arXiv:1112.6098 (2011), https://arxiv.org/abs/1112.6098.

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

pieces of PI as they visited certain websites.[99] To calculate the value users placed on their Personal Information, Carrascal and colleagues employed a reverse second-price auction mechanism in which participants bid on the minimum amount of money they would accept to sell specific pieces of their Personal Information in exchange for internet-based services they were using.[100]

185.    The results of Carrascal's study were the following Personal Information valuations:

a.    Offline information (age address, economic stats): €25

b.    Browsing History: €7

c.    Interactions on social networks: €12

d.    Search History: €2

e.    Shopping Activity: €5

186.    What these studies, and others,[101] show is that individuals place an economic value on their Personal Information, and are willing to engage in economic transactions in which they will grant access to their Personal Information in exchange for internet-based services. Defendant's unauthorized collection of their Personal Information deprived individuals of this opportunity.

187.    On the open market, Personal Information is often mined, compiled, and resold by data brokers. Further, there is a market for consumers to monetize Personal Information and the behavioral preferences that Defendant has usurped. Published analyses and studies have placed a value in excess of $200 on an individual's Personal Information.[102]

188.    A child's Personal Information has equivalent (or potentially greater) value than that of an adult. It is well-established that children are more susceptible to being influenced by

---

[99] Juan Pablo Carrascal et al., *Your Browsing Behavior for a Big Mac: Economics of Personal Information Online*, arXiv preprint arXiv:1112.6098 (2011), https://arxiv.org/abs/1112.6098.

[100] Juan Pablo Carrascal et al., *Your Browsing Behavior for a Big Mac: Economics of Personal Information Online*, arXiv preprint arXiv:1112.6098 (2011), https://arxiv.org/abs/1112.6098.

[101] Jacopo Staiano et al., *Money Walks: A Human-Centric Study on the Economics of Personal Mobile Data*, arXiv preprint arXiv:1407.0566 (2014), https://arxiv.org/abs/1407.0566 (finding that location information is the most valued type of personal data, with a median value of approximately €25, and that participants showed significant sensitivity towards monetizing their personal information collected via mobile phones).

[102] *Can you Put a Price on Your Personal Data*, June 28, 2019, NYTimes, https://www.nytimes.com/2019/06/28/technology/data-price-big-tech.html.

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

advertisements and often cannot tell the difference between content and advertisements in child-directed videos. And Defendant may be able to utilize children's Personal Information to show them behavior-targeted advertising for the duration of their lives.

189.    Personal Information also has a value based on consumers' privacy interests. In a recent study by the Pew Research Center, 93% of Americans said it was "important" for them to be "in control of who can get information" about them. Seventy-four percent said it was "very important." Eighty-seven percent of Americans said it was "important" for them not to have someone watch or listen to them without their permission. Sixty-seven percent said it was "very important." And 90% of Americans said it was "important" that they be able to "control[] what information is collected about [them]." Sixty-five percent said it was very important.[103]

190.    Likewise, in a 2011 Harris Poll study, 76% of Americans agreed that "online companies . . . control too much of our personal information and know too much about our browsing habits."[104]

191.    A number of platforms have developed that allow consumers to directly monetize their own data and prevent tech companies from targeting them absent their express consent:

      a.    Brave's web browser, for example, will pay users to watch online targeted ads, while blocking out everything else.[105]

---

[103] https://www.pewresearch.org/internet/2015/05/20/americans-attitudes-about-privacy-security-andsurveillance/#:~:text=93%25%20of%20adults%20say%20that,it%20is%20%E2%80%9Csomewhat%20important.%E2%80%9D.

[104] https://www.prnewswire.com/news-releases/majorities-think-some-online-companies-are-toopowerful-121986453.html.

[105] Get Paid to Watch Ads in the Brave Web Browser, at: https://lifehacker.com/get-paid-to- watch-adsin-the-brave-web-browser-1834332279#:~:text=Brave%2C%20a%20chromiumbased%20web%20browser%20that%20boasts%20an,a%20more%20thoughtful%20way%20than%20we%E2%80%99re%20accustomed%20to (Lifehacker, April 26, 2019) ("The model is entirely opt-in, meaning that ads will be disable by default. The ads you view will be converted into Brave's cryptocurrency, Basic Attention Tokens (BAT), paid out to your Brave wallet monthly").

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

b. Loginhood states that it "lets individuals earn rewards for their data and provides website owners with privacy tools for site visitors to control their data sharing," via a "consent manager" that blocks ads and tracking on browsers as a plugin.[106]

c. Andrew Yang's "Data Dividend Project" aims to help consumers, "[t]ake control of your personal data. If companies are profiting from it, you should get paid for it."[107]

d. Killi is a new data exchange platform that allows consumers to own and earn from their data.[108]

e. Similarly, BIGtoken "is a platform to own and earn from your data. You can use the BIGtoken application to manage your digital data and identity and earn rewards when your data is purchased."[109]

f. The Nielsen Company, famous for tracking the behavior of television viewers' habits, has extended its reach to computers and mobile devices through the Nielsen Computer and Mobile Panel. By installing the application on a consumer's computer, phone, tablet, ereader, or other mobile device, Nielsen tracks the user's activity, enters that user into sweepstakes with monetary benefits, and allows the user to earn points worth up to $50 per month.[110]

192. Technology companies recognize the monetary value of users' Personal Information, insofar as they encourage users to install applications explicitly for the purpose of selling that information to technology companies in exchange for monetary benefits.[111]

---

[106] https://loginhood.io/. *See also*, https://loginhood.io/product/chrome-extension ("[s]tart earning rewards for sharing data – and block others that have been spying on you. Win-win.").

[107] How Does It Work, at: https://www.datadividendproject.com/ ("Get Your Data Dividend…We'll send you $$$ as we negotiate with companies to compensate you for using your personal data.").

[108] https://killi.io/earn/.

[109] https://bigtoken.com/faq#general_0 ("Third-party applications and sites access BIGtoken to learn more about their consumers and earn revenue from data sales made through their platforms. Our BIG promise: all data acquisition is secure and transparent, with consumers made fully aware of how their data is used and who has access to it.").

[110] Kevin Mercandante, Ten Apps for Selling Your Data for Cash, Best Wallet Hacks (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.

[111] Kari Paul, *Google launches app that will pay users for their data*, The Guardian (June 11, 2019),

193.    The California Consumer Protection Act ("CCPA") recognizes that consumers' personal data is a property right. Not only does the CCPA prohibit covered businesses from discriminating against consumers that opt out of data collection, the CCPA also expressly provides that: "[a] business may offer financial incentives, including payments to consumers as compensation, for the collection of personal information, the sale of personal information, or the deletion of personal information." Cal. Civ. Code § 1798.125(b)(1). The CCPA provides that "[a] business shall not use financial incentive practices that are unjust, unreasonable, coercive, or usurious in nature." Cal. Civ. Code § 1798.125(b)(4).

194.    Similarly, courts have recognized that internet users have a property interest in their Personal Information and that Personal Information is, thus, an asset with economic value.[112]

195.    Through its unfair and deceptive conduct, Defendant has misappropriated the Personal Information of Plaintiffs and the members of the Classes, destroyed the principal aspect of the Personal Information that provided its value to Plaintiffs and the members of the Classes, and diminished the value of the Personal Information.

196.    Defendant's unlawful collection and commercial exploitation of the Personal Information of Plaintiffs and Class members has deprived Plaintiffs and Class members of the right and privilege of ownership that was most important to them – the right to maintain the privacy of their Personal Information and NOT to sell it. Defendant's conduct has thus destroyed the fundamental quality of the asset and diminished its value to Plaintiffs and the Class members.

---

https://www.theguardian.com/technology/2019/jun/11/facebook-user-data-app-privacy- study; Saheli Roy Choudhury and Ryan Browne, Facebook pays teens to install an app that could collect all kinds of data, CNBC (Jan. 30, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-appto-collect-data-techcrunch.html; Jay Peters, Facebook will now pay you for your voice recordings, The Verge (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voicespeech-recognition-viewpoints-pronunciations-app.

[112] *See, e.g., CTC Real Estate Servs. v. Lepe,* 140 Cal. App. 4th 856, 860, 44 Cal.Rptr.3d 823 (2006) ("A person's identifying information is a valuable asset."); *accord In re Facebook Internet Tracking Litig.,* 956 F.3d 589, 600 (9th Cir. 2020) (citing *Lepe* and holding that the plaintiffs had suffered economic injury after Facebook allegedly took their personal information in a similar process to that alleged here).

197.    For those Plaintiffs and Class members who would choose to sell their Personal Information in what is a well-established and readily available marketplace, Defendants' conduct has diminished the amount a knowledgeable buyer would be willing to pay for the Information.

198.    For children (or their parents) for whom the sole value of the Personal Information derives from maintaining user privacy, the economic value of the Personal Information has been completely destroyed by Defendant's collection and use of it.

199.    Plaintiffs and the members of the Classes have, thus, suffered economic loss and injury in one or more of the following respects:

   a.  Defendant unlawfully took possession of and commercially exploited the Personal Information of Plaintiffs and the members of the Classes without their permission and without compensation; and

   b.  Defendant's unlawful collection and exploitation of the Personal Information of Plaintiffs and the members of the Classes have destroyed the private quality of the Personal Information and have deprived Plaintiffs and the members of the Classes of the ability to determine whether or not to keep their Personal Information private and when or if to sell their Personal Information—valuable aspects of their rights of ownership that were of paramount importance to Plaintiffs and the members of the Classes in this case—and, thus, diminished the value of the Personal Information.

**VII.    Defendant has Caused and Is Continuing to Cause and/or Facilitate COPPA Violations for Which There is No Adequate Remedy at Law**

200.    Plaintiffs and members of the Clas are likely to use Roku in the future and seek protection from Defendant's continuing COPPA violations.

201.    To date, Defendant has no policy of ensuring the Personal Information it collects and discloses to third parties, or which it collects from third parties, is not from children under 13, like Plaintiffs and members of the Class, and therefore, Defendant is continuing to cause and/or facilitate violations of COPPA.

202.   Additionally, COPPA's protections include a prohibition on an operator's retention of COPPA-protected Personal Information, and because the wrongfully collected Personal Information of Plaintiffs and the members of the Class remains in the possession of Defendant, it is subject to misuse by Defendant, such that Plaintiffs and the members of the Class are entitled to the security of that statutory protection.

203.   Furthermore, Defendant has obtained profits realized from its wrongful exploitation of the Personal Information of Plaintiffs and members of the Class. No remedy at law available to Plaintiffs and the Class reaches these profits or is available to prevent Defendant from retaining such profits. The law requires imposition of equitable orders of non-restitutionary disgorgement to prevent Defendant from profiting from their misconduct even without any showing of a corresponding economic harm suffered by the Plaintiffs and the members of the Classes from Defendant's receipt of such profits.[113]

204.   Money damages will not protect Plaintiffs and the members of the Class from the non-economic harms discussed herein posed by misuse of their Personal Information collected in violation of COPPA or Defendant's impermissible profit from its misconduct, and Plaintiffs and the Class, thus, have no adequate remedy at law. However, to the extent that money damages, if available, would constitute an adequate remedy at law barring recovery, Plaintiffs and members of the Class assert their claims for the equitable relief set forth herein as an alternative remedy pending a final determination of the availability of a remedy at law.

205.   For these reasons, Plaintiffs and the Class seek entry of a permanent injunction: (a) requiring Roku to destroy all Personal Information of Plaintiffs and the Class in the possession of Roku that was collected in violation of COPPA; (b) requiring Roku to notify each Plaintiff and Class member that his or her Personal Information was collected and has been destroyed; (c) restraining Roku from directly or indirectly using or benefiting from the Personal Information of Plaintiffs and the Class that it wrongly collected, including precluding the use of any profile of any Plaintiff or

---

[113] *In re Facebook, Inc. Internet Tracking Litigation,* 956 F.3d 589, 599–600 (9th Cir. 2020).

Class member developed in whole or in part based on such information and serving targeted or behavioral advertising; and (d) requiring Roku's relinquishment of all ill-gotten gains.

## ALLEGATIONS RELATING TO PLAINTIFFS

**I.    Plaintiff A.A.**

206.    Plaintiff A.A. watched content and advertisements on Roku, including on a Roku streaming stick.

207.    Plaintiff A.A. viewed and interacted with child-directed content on Roku's platforms, including Kids & Family on The Roku Channel, HappyKids, and CoComelon.

208.    Plaintiff A.A. also viewed and interacted with the YouTube channel on Roku's platform, including ChuChuTV Nursery Rhymes & Kids Songs, Ryan's World (f/k/a Ryan ToysReview), Mattel, Hasbro, Cartoon Network, DreamWorksTV, My Little Pony Official, Play-Doh, Official Play-Doh How To Videos, Baby Alive Official, NERF Official, Transformer Official, Barbie, Monster High, Hot Wheels, Thomas & Friends, Steven Universe, The Powerpuff Girls, and Teen Titans Go.

209.    While viewing and interacting with child-directed content on Roku's platforms, Plaintiff A.A. saw ads that appeared specifically directed to Plaintiff.

210.    Roku collected and enabled collection of Plaintiff A.A.'s Personal Information to track, profile, and target Plaintiff with advertisements as Plaintiff watched Defendant's child-directed content.

211.    Roku did not obtain verifiable parental consent prior to the collection of Plaintiff A.A.'s Personal Information.

212.    Neither Plaintiff A.A. nor their parent and guardian could have reasonably discovered this conduct earlier through investigation. Plaintiff A.A. is a minor unable to consent to or understand Defendant's tracking of personal information, and Defendant concealed from and misled Ms. Bolin about its tracking, profiling, and targeting of her child.

213.    Roku's tracking, profiling, and targeting of Plaintiff A.A. without parental consent by Roku is highly offensive and constitutes an invasion of Plaintiff's privacy.

214.    Plaintiff A.A.  is likely to use Roku in the future and seeks protection from Defendant's continuing violations of COPPA protections.

**II.    Plaintiff A.B.**

215.    Plaintiff A.B. watched content and advertisements on Roku, including on a Roku streaming stick. Plaintiff also used voice search commands to find content.

216.    Plaintiff A.B. viewed and interacted with child-directed content on Roku's platforms, including Kids & Family on The Roku Channel, HappyKids, CoComelon, Nickelodeon, PBS, WGN, Peppa Pig, and Bluey.

217.    Plaintiff A.B. also viewed and interacted with the YouTube channel on Roku's platform, including Handy Mandy, Ryan's World (f/k/a Ryan Toys Review), Cartoon Network, DreamWorksTV, Play-Doh, Roblox, NERF Official, Transformer Official, Hot Wheels, and Thomas & Friends.

218.    While viewing and interacting with child-directed content on Roku's platforms, Plaintiff A.B. saw ads that appeared specifically directed to Plaintiff.

219.    Roku collected and enabled collection of Plaintiff A.B.'s Personal Information to track, profile, and target Plaintiff with advertisements as Plaintiff watched Defendant's child-directed content.

220.    Roku did not obtain verifiable parental consent prior to the collection of Plaintiff A.B.'s Personal Information.

221.    Neither Plaintiff A.B.  nor their parent and guardian could have reasonably discovered this conduct earlier through investigation. Plaintiff A.B.  is a minor unable to consent to or understand Defendant's tracking of personal information, and Defendant concealed from and misled Ms. Johnson about its tracking, profiling, and targeting of her child.

222.    Roku's tracking, profiling, and targeting of Plaintiff A.B. without parental consent by Roku is highly offensive and constitutes an invasion of Plaintiff's privacy.

223.    Plaintiff A.B. is likely to use Roku in the future and seeks protection from Defendant's continuing violations of COPPA protections.

**III.    Plaintiff A.C.**

224.    Plaintiff A.C. watched content and advertisements on Roku, including on a Roku streaming stick and Roku-enabled TV. Plaintiff also used voice search commands.

225.    Plaintiff A.C. viewed and interacted with child-directed content on Roku's platforms, including Kids & Family on The Roku Channel, Nickelodeon, and PBS.

226.    Plaintiff A.C. also viewed and interacted with the YouTube channel on Roku's platform, including Spidey, Number Blocks, Hot Wheels Blaz, Roblox, and Cart.

227.    While viewing and interacting with child-directed content on Roku's platforms, Plaintiff A.C. saw ads that appeared specifically directed to Plaintiff.

228.    Roku collected and enabled collection of Plaintiff A.C.'s Personal Information to track, profile, and target Plaintiff with advertisements as Plaintiff watched Defendant's child-directed content.

229.    Roku did not obtain verifiable parental consent prior to the collection of Plaintiff A.C.'s Personal Information.

230.    Neither Plaintiff A.C. nor their parent and guardian could have reasonably discovered this conduct earlier through investigation. Plaintiff A.C. is a minor unable to consent to or understand Defendant's tracking of personal information, and Defendant concealed from and misled Mr. Johnson about its tracking, profiling, and targeting of his child.

231.    Roku's tracking, profiling, and targeting of Plaintiff A.C. without parental consent by Roku is highly offensive and constitutes an invasion of Plaintiff's privacy.

232.    Plaintiff A.C. is likely to use Roku in the future and seeks protection from Defendant's continuing violations of COPPA protections.

**IV.    Plaintiff A.D.**

233.    Plaintiff A.D. watched content and advertisements on Roku, including on a Roku streaming stick and Roku-enabled TV. Plaintiff A.D. also used a Roku voice-enable remote control.

234.    Plaintiff A.D. viewed and interacted with child-directed content on Roku's platforms, including on Kids & Family on The Roku Channel.

235.   Plaintiff A.D.  also viewed and interacted with the YouTube channel on Roku's platform.

236.   While viewing and interacting with child-directed content on Roku's platforms, Plaintiff A.D. saw ads that appeared specifically directed to Plaintiff.

237.   Roku collected and enabled collection of Plaintiff A.D.'s Personal Information to track, profile, and target Plaintiff A.D. with advertisements as Plaintiff A.D. watched Defendant's child-directed content.

238.   Roku did not obtain verifiable parental consent prior to the collection of Plaintiff A.D.'s Personal Information.

239.   Neither Plaintiff A.D. nor their parent and guardian could have reasonably discovered this conduct earlier through investigation. Plaintiff A.D. is a minor unable to consent to or understand Defendant's tracking of personal information, and Defendant concealed from and misled Mr. Langsam about its tracking, profiling, and targeting of his child.

240.   Roku's tracking, profiling, and targeting of Plaintiff A.D. without parental consent by Roku is highly offensive and constitutes an invasion of Plaintiff's privacy.

241.   Plaintiff A.D. is likely to use Roku in the future and seeks protection from Defendant's continuing violations of COPPA protections.

**V.     Plaintiff A.E.**

242.   Plaintiff A.E. watched content and advertisements on Roku, including on a Roku-enabled TV with a single household account.

243.   Plaintiff A.E. viewed and interacted with child-directed content on Roku's platforms, including Kids & Family on The Roku Channel and CoComelon.

244.   Plaintiff A.E. also viewed and interacted with the YouTube channel on Roku's platform, including the following content: Bluey, Peppa Pig, and That's how Much I Love You, as well as shows where kids are playing with toys.

245.   While viewing and interacting with child-directed content on Roku's platforms, Plaintiff A.E. saw ads that appeared specifically directed to Plaintiff.

246.    Roku collected and enabled collection of Plaintiff A.E.'s Personal Information to track, profile, and target Plaintiff A.E. with advertisements as Plaintiff A.E. watched Defendant's child-directed content.

247.    Roku did not obtain verifiable parental consent prior to the collection of Plaintiff A.E.'s Personal Information.

248.    Neither Plaintiff A.E. nor their parent and guardian could have reasonably discovered this conduct earlier through investigation. Plaintiff A.E. is a minor unable to consent to or understand Defendant's tracking of personal information, and Defendant concealed from and misled Mr. Stratton about its tracking, profiling, and targeting of his child.

249.    Roku's tracking, profiling, and targeting of Plaintiff A.E. without parental consent by Roku is highly offensive and constitutes an invasion of Plaintiff A.E.'s privacy.

250.    Plaintiff A.E. is likely to use Roku in the future and seeks protection from Defendant's continuing violations of COPPA protections.

**VI.    Plaintiff A.F.**

251.    Plaintiff A.F. watched content and advertisements on Roku, including on a Roku-enabled TV.

252.    Plaintiff A.F. viewed and interacted with child-directed content on Roku's platforms, including Kids & Family on The Roku Channel and Ms. Rachel.

253.    Plaintiff A.F. also viewed and interacted with the YouTube channel on Roku's platform, including the following content: Bluey, Peppa Pig, Cartoon Network, Thomas & Friends, and generally kids playing with toys.

254.    While viewing and interacting with child-directed content on Roku's platforms, Plaintiff A.F. saw ads that appeared specifically directed to Plaintiff.

255.    Roku collected and enabled collection of Plaintiff A.F.'s Personal Information to track, profile, and target Plaintiff A.F. with advertisements as Plaintiff A.F. watched Defendant's child-directed content.

256.    Roku did not obtain verifiable parental consent prior to the collection of Plaintiff A.F.'s Personal Information.

257.    Neither Plaintiff A.F. nor their parent and guardian could have reasonably discovered this conduct earlier through investigation. Plaintiff A.F.  is a minor unable to consent to or understand Defendant's tracking of personal information, and Defendant concealed from and misled Mr. Vandersmitte about its tracking, profiling, and targeting of his child.

258.    Roku's tracking, profiling, and targeting of Plaintiff A.F. without parental consent by Roku is highly offensive and constitutes an invasion of Plaintiff A.F.'s privacy.

259.    Plaintiff A.F. is likely to use Roku in the future and seeks protection from Defendant's continuing violations of COPPA protections.

## TOLLING AND ESTOPPEL

### I.    Discovery Rule Tolling

260.    Plaintiffs and the Classes had no way of knowing about Defendant's conduct with respect to the collection and impermissible and unauthorized use of, and profit from, the Personal Information of Plaintiffs and the members of the Classes.

261.    Neither Plaintiffs nor any other members of the Classes, through the exercise of reasonable diligence, could have discovered the conduct alleged herein. Further, Plaintiffs and the members of the Classes did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Defendant was engaged in the conduct alleged herein.

262.     For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims asserted by Plaintiffs and the Classes.

### II.    Fraudulent Concealment Tolling

263.    By failing to provide notice of the collection and use of the Personal Information and obtain verifiable consent, in violation of COPPA and societal norms and conventions, Defendant concealed its conduct and the existence of the claims asserted herein from Plaintiffs and the members of the Classes.

264. Upon information and belief, Defendant intended by its acts to conceal the facts and claims from Plaintiffs and members of the Classes. Plaintiffs and the members of the Classes were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered Defendant's conduct. For this reason, any statute of limitations that otherwise may apply to the claims of Plaintiffs or members of the Classes should be tolled.

**III.     Estoppel**

265. Despite its duties and obligations under COPPA, Defendant failed to provide notice of the collection and use of the Personal Information and obtain verifiable consent in breach and violation thereof. Defendant therefore is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

266. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

**I.     The National Class**

267. Plaintiffs, through their parents and guardians, seek class certification of claims for violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, defined as follows:

> All persons who were 13 or younger when they used Roku, and from whom Defendant collected, caused to be collected, used, or disclosed Personal Information without first obtaining verified parental consent during the Class Period.

**II.     The California Class**

268. Plaintiffs A.C. and A.F., through their parents and guardians, seek class certification of claims for violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, violation of the State of California Constitution Right to Privacy, intrusion upon seclusion, and unjust enrichment on behalf of a California Class defined as follows:

> All persons residing in the State of California who were 13 or younger when they used Roku, and from whom Defendant collected, caused to be collected, used, or disclosed Personal Information without first obtaining verified parental consent during the Class Period.

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.    The Illinois Class

269.    Plaintiffs A.A. and A.B., through their parents and guardians, seek class certification of claims for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. 505/2 *et seq.*, intrusion upon seclusion, and unjust enrichment on behalf of an Illinois Class defined as follows:

> All persons residing in the State of Illinois who were 13 or younger when they used Roku, and from whom Defendant collected, caused to be collected, used, or disclosed Personal Information without first obtaining verified parental consent during the Class Period.

### IV.    The Nevada Class

270.    Plaintiff A.E., through their parent and guardian, seeks class certification of claims for violation of the Nevada Trade Regulation and Practices Act (NTRPA), Nev. Rev. Stat. Ann. § 598.0903, *et seq.,* intrusion upon seclusion, and unjust enrichment on behalf of a Nevada class defined as follows:

> All persons residing in the State of Nevada who were 13 or younger when they used Roku, and from whom Defendant collected, caused to be collected, used, or disclosed Personal Information without first obtaining verified parental consent during the Class Period.

### V.    The New Jersey Class

271.    Plaintiff A.D., through their parent and guardian, seeks class certification of claims for violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et. seq.* (NJCFA), intrusion upon seclusion, and unjust enrichment on behalf of a New Jersey class defined as follows:

> All persons residing in the State of New Jersey who were 13 or younger when they used Roku, and from whom Defendant collected, caused to be collected, used, or disclosed Personal Information without first obtaining verified parental consent during the Class Period.

272.    **Ascertainability.** The proposed Classes are readily ascertainable because they are defined using objective criteria so as to allow class members to determine whether they are part of a Class. Further, the Classes can be identified through records maintained by Defendant.

273. **Numerosity (Rule 23(a)(1)).** The Classes are so numerous that joinder of individual members herein is impracticable. The exact number of members of the Classes, as herein identified and described, is not known, but download figures indicate that Roku has collected information on millions of children.

274. **Commonality (Rule 23(a)(2)).** Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class members, including the following:

    a.  Whether Defendant collected the Personal Information of children;

    b.  Whether Defendant had knowledge they were collecting the Personal Information of children;

    c.  Whether Defendant obtained parental consent to collect the Personal Information of children;

    d.  Whether the collection of Personal Information of children is highly offensive to a reasonable person;

    e.  Whether the collection of Personal Information of children without parental consent is sufficiently serious and unwarranted as to constitute an egregious breach of social norms;

    f.  Whether Defendant's conduct constituted an invasion of privacy based on common law protection against intrusion upon seclusion under the laws of California, Illinois, Nevada, and New Jersey;

    g.  Whether Defendant's conduct violated the California Constitution right to privacy;

    h.  Whether Defendant's conduct was unfair;

    i.  Whether Defendant's conduct was unlawful;

    j.  Whether Defendant's conduct violated the consumer protection acts of California, Illinois, Nevada, and New Jersey;

    k.  Whether Plaintiffs and the Classes are entitled to monetary damages and the measure of those damages;

l.   Whether Defendant was unjustly enriched by their conduct under the laws of California, Illinois, Nevada, and New Jersey;

m.  Whether Defendant fraudulently concealed its conduct; and

n.   Whether Plaintiffs and the Classes are entitled to injunctive or other equitable relief.

275.   **Typicality (Rule 23(a)(3)).** Plaintiffs' claims are typical of the claims of the other members of the proposed Classes. Plaintiffs and members of the Classes (as applicable) suffered an invasion of privacy and injuries as a result of Defendant's wrongful conduct that is uniform across the Classes.

276.   **Adequacy (Rule 23(a)(4)).** Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interest that is antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so. Neither Plaintiffs nor Plaintiffs' counsel have any interest adverse to those of the other members of the Classes.

277.   **Substantial Benefits.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Classes is impracticable. The prosecution of separate actions by individual members of the Classes would impose heavy burdens upon the Courts and Defendant, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Classes, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

278.    Class certification is thus appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Classes, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

279.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Classes, so that final injunctive relief or corresponding declaratory relief, if any, that may be awarded by the Court is appropriate as to the Classes as a whole.

280.    Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## **CLAIMS FOR RELIEF**

## **CLAIM 1**

### **VIDEO PRIVACY PROTECTION ACT (VPPA),**

### **18 U.S.C. § 2710**

**(Brought on behalf of all Plaintiffs and members of the Class)**

281.    Plaintiffs and members of the Class re-allege the foregoing allegations as if fully set forth herein.

282.    The Video Privacy Protection Act (VPPA) provides that "[a]ny person aggrieved by any act of a person in violation of this section may bring a civil action in a United States district court." 18 U.S.C. § 2710(c)(1).

283.    Under the VPAA, "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person[.]"18 U.S.C. § 2710(b).

284.    Defendant is a "video tape service provider" within the meaning of the VPAA because it is "engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of . . . audio visual materials." § 2710(a)(4). Courts have recognized that online streaming

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

services like Roku fall under the definition of "video tape service provider." *See, e.g., In re Hulu Privacy Litig.*, at *5–6 (N.D. Cal. Aug. 10, 2012); *Lee v. Plex, Inc.*, No. 24-cv-02386-EKL, 2025 WL 948118, at *1 (N.D. Cal. Mar. 28, 2025).

285.    Plaintiffs and members of the Class are each a "consumer" within the meaning of the VPAA because they (1) use Roku, (2) purchased Roku hardware and/or (3) created an account with Roku in order to access programming on Roku. 18 U.S.C. § 2710(a)(1). In the alternative, any Roku account holder, or any Roku user who purchases or subscribes to video content on or through Roku, is a Roku "consumer." *Id.*

286.    Defendant has collected and disclosed to third parties—and continues to collect and disclose to third parties—its users' Personal Information defined as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

287.    Specifically, as alleged above, Defendant knowingly collects the Personal Information of children under the age of 13, including Plaintiffs and members of the Class and uses and retains that Personal Information for its own profit. Defendant also discloses the Personal Information it collects to a number of third parties, including Google, New Relic, Meta, LinkedIn, Nextdoor, and Innovid.

288.    By disclosing the Personal Information to third parties, Roku violated Plaintiffs' and members of the Class's statutorily protected rights to privacy in the videos they requested or obtained from Roku.

289.    The VPPA also requires that "[a] person subject to this section shall destroy personally identifiable information as soon as practicable, but no later than one year from the date the information is no longer necessary for the purpose for which it was collected and there are no pending requests or orders for access to such information under subsection (b)(2) or (c)(2) or pursuant to a court order." 18 U.S.C. § 2710(e).

290.    As set forth above, Defendant retains the Personal Information of Plaintiffs and members of the Class for its own profit, including to create behavioral advertising. Defendant's practices of retaining Personal Information of Plaintiffs and members of the Class violate the VPAA.

291.    The VPPA provides for liquidated damages in the amount of $2,500 per violation of the statute, among other relief. Plaintiffs and members of the Class seek to recover these liquidated damages, as well as all other relief deemed proper.

292.    The VPPA also provides for injunctive relief. 18 U.S.C. § 2710(c)(2). Defendant's collection, retention, and disclosure, of the Personal Information of Plaintiffs and members of the Class presents a continuing risk to them as well as the general public. As a result, Plaintiffs and members of the Class seek an injunction requiring Defendant to permanently delete, destroy or otherwise sequester the Personal Information collected, requiring Defendant to provide a complete audit and accounting of the uses of the Personal Information by them and any other third parties, and other appropriate injunctive and/or declaratory relief.

## CLAIM 2

### CALIFORNIA CONSTITUTIONAL RIGHT TO PRIVACY,

### Cal. Const. Art. 1, § 1

### (Brought on behalf of Plaintiffs A.C. and A.F. and the California Class)

293.    Plaintiffs A.C., A.F., and members of the California class re-allege the foregoing allegations as if fully set forth herein.

294.    A.C., A.F., and members of the California class's private affairs include their behavior on their streaming devices, as well as any other behavior that may be monitored by the surreptitious tracking employed or otherwise enabled by Defendant.

295.    The parents and guardians of A.C., A.F., and members of the California class have reasonable expectations of privacy in their children's devices, including televisions, and their online behavior and activities, generally.

296.    A.C., A.F., and members of the California class's private affairs, concerns, and seclusion includes their interest in their Personal Information as defined by COPPA, which includes data points concerning their location and online activity while using internet-connected devices.

297.    Defendant intentionally intruded upon the private affairs, concerns, and seclusion of A.C., A.F., and California class members by improperly accessing the Personal Information of A.C., A.F., and California class and using it for improper purposes, including by targeting them with behavioral advertising that would be highly offensive to a reasonable person, constituting an egregious breach of social norms and/or enabling the targeting of A.C., A.F., and California class members with such advertisements, as detailed herein.

298.    Defendant's intrusions upon the private affairs, concerns, and seclusion of A.C., A.F., and California class members were substantial, and would be highly offensive to a reasonable person, constituting an egregious breach of social norms, as is evidenced by countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, and scholarly literature on consumers' reasonable expectations.

299.    As minor children, A.C., A.F., and members of the California class lacked the ability to form expectations about reasonable privacy or to consent to Defendant's actions.

300.    Neither A.C., A.F., members of the California class, nor their parents and/or guardians consented to Defendant's intrusions upon their private affairs, concerns, and seclusions.

301.    A.C., A.F., and members of the California class suffered actual and concrete injury as a result of Defendant's intrusions upon the private affairs, concerns, and seclusion of A.C., A.F., and members of the California class.

302.    A.C., A.F., and members of the California class seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Defendant's invasions of privacy, as well as disgorgement of profits made by Defendant as a

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

result of their intrusions upon A.C., A.F., and members of the California class's private affairs, concerns, and seclusion.

## CLAIM 3

## CALIFORNIA INTRUSION UPON SECLUSION

### (Brought on behalf of Plaintiff A.C. and A.F. and the California Class)

303.    Plaintiff A.C., A.F., and members of the California class re-allege the foregoing allegations as if fully set forth herein.

304.    A.C., A.F., and members of the California class's private affairs, concerns, and seclusion includes their interest in their Personal Information as defined by COPPA, which includes data points concerning their location and online activity while using internet-connected devices.

305.    Defendant intentionally intruded upon the private affairs, concerns, and seclusion of A.C., A.F., and California class members by improperly accessing the Personal Information of A.C., A.F., and California class members and using it for improper purposes, including by targeting them with behavioral advertising that would be highly offensive to a reasonable person, constituting an egregious breach of social norms and/or enabling the targeting of A.C., A.F., and California class members with such advertisements, as detailed herein.

306.    Defendant's intrusions upon the private affairs, concerns, and seclusion of A.C., A.F., and California class members were substantial, and would be highly offensive to a reasonable person, constituting an egregious breach of social norms, as is evidenced by countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, and scholarly literature on consumers' reasonable expectations.

307.    As minor children, A.C., A.F., and members of the California class lacked the ability to form expectations about reasonable privacy or to consent to Defendant's actions.

308.    Neither A.C., A.F., members of the California class, nor their parents and/or guardians consented to Defendant's intrusions upon their private affairs, concerns, and seclusions.

70

309.    A.C., A.F., and members of the California class suffered actual and concrete injury as a result of Defendant's intrusions upon A.C., A.F., and California class members' private affairs, concerns, and seclusion.

310.    A.C., A.F., and members of the California class seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Defendant's invasions of privacy, as well as disgorgement of profits made by Defendant as a result of their intrusions upon A.C., A.F., and members of the California class's private affairs, concerns, and seclusion.

## CLAIM 4

### CALIFORNIA UNFAIR COMPETITION LAW (UCL),

### Cal. Bus. & Prof. Code § 17200, *et seq.*

### (Brought on behalf of Plaintiff A.C. and A.F. and the California Class)

311.    Plaintiff A.C., A.F., and members of the California class incorporate the foregoing allegations as if fully set forth herein.

312.    A.C., A.F., and members of the California class are or were residents of California and/or viewed child-directed content in California hosted and/or created by Defendant on Roku.

313.    At all times mentioned herein, Defendant engaged in "trade" or "commerce" in California in that it engaged in the advertising, offering for sale, sale, and distribution of property or any other articles, commodities, or things of value in California.

314.    Defendant is a "person" within the meaning of Cal. Bus. & Prof. Code § 17201.

315.    Defendant engaged in consumer-oriented acts through the offering, promoting, and/or distributing of Roku and child-directed content hosted thereon, which significantly impacted the public because Roku is used nationwide, including in California, and there are millions of users, including A.C., A.F., and members of the California class.

316.    Cal. Bus. & Prof. Code § 17200, et seq. (the "UCL") broadly prohibits "unfair competition", which the UCL defines as including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising[.]"

317.    California courts have noted that "the differences [between the UCL and FTC Act] are not of a degree to impair comparison" and that unfair acts respectively proscribed in the two statutes "appear practically synonymous." *People ex rel. Mosk v. Nat'l Rsch. Co. of Cal.,* 201 Cal. App. 2d 765, 773, 20 Cal. Rptr. 516, 521 (Ct. App. 1962). As a result, California courts deem "decisions of the federal court [construing the FTC Act] are more than ordinarily persuasive." *Id.*

318.    Defendant violated Cal. Bus. & Prof. Code § 17200, *et seq.* by engaging in the unfair acts or practices proscribed by Cal. Bus. & Prof. Code § 17200, *et seq.* outlined herein.

319.    Defendant at all relevant times knowingly violated legal duties and public policy by unfairly and unlawfully collecting the Personal Information of minor children and tracking, profiling, and targeting those children with behavioral advertising for Defendant's commercial financial gain.

320.    As outlined herein, Defendant at all times had actual knowledge of its own non-compliance with COPPA and other applicable privacy-related laws. Further, Defendant at all times had actual knowledge of their own collection—or the collection by third parties—of the Personal Information from A.C., A.F., and California class members and the tracking, profiling, and targeting of those children for lucrative behavioral advertising.

321.    As outlined herein, Defendant intentionally designed Roku to, among other things, attract minor children by making child-directed content available to them so that Defendant could collect the Personal Information of those children and serve them with lucrative, intrusive, behavioral advertising for substantial commercial gain.

322.    Defendant is considered by the FTC to be an "operator" as defined under COPPA and FTC regulations.

323.　Defendant collected Personal Information from minor children through Roku channels and applications created, hosted, and maintained by Defendant, which were directed to children under 13.

324.　In particular, Defendant systematically collected, used, and/or disclosed Personal Information from minor children in violation of COPPA, and therefore the FTC Act, to serve them targeted, behavioral advertising by *inter alia*:

  a. Failing to provide sufficient notice of the information Defendant collected, or the information that was collected on Defendant's behalf, online from children under 13, how Defendant used such information, its disclosure practices, and all other required content, in violation of Section 312.4(d) of COPPA, 16 C.F.R. § 312.4(d);

  b. Failing to provide direct notice to parents of the information Defendant collected, or the information that was collected on Defendant's behalf, online from children under 13, how Defendant used such information, its disclosure practices, and all other required content, in violation of Section 312.4(b) and (c) of COPPA, 16 C.F.R. § 312.4(b)-(c);

  c. Failing to obtain verifiable parental consent before any collection or use of Personal Information from children under 13, in violation of Section 312.5 of COPPA, 16 C.F.R. § 312.5; and

  d. Failing to establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of Personal Information collected from children under 13, in violation of Section 312.8 of COPPA, 16 C.F.R. § 312.8.

325.　Violations of COPPA and the accompanying FTC regulations "shall be treated as a violation of a rule defining an unfair … act or practice prescribed under 15 U.S.C. § 57a(a)(1)(B)." 15 U.S.C. § 6502(c).  These rules define unfair acts or practices in or affecting commerce within the

meaning of 15 U.S.C. § 45(a)(1), which is the model for the various consumer protection statutes in the several states, including the Cal. Bus. & Prof. Code § 17200, et seq.[114]

326.    Accordingly, Defendant engaged in unfair and unlawful trade acts or practices in violation of Cal. Bus. & Prof. Code § 17200, et seq., which is modeled after, proscribes the same conduct as, and gives deference to the definitions of the FTC Act.

327.    Defendant's conduct is unfair, immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, and there are no greater countervailing benefits to consumers or competition.  Further, A.C., A.F., and members of the California class could not have reasonably avoided injury because Defendant took advantage of the lack of knowledge, ability, experience, and/or capacity of consumers—in this case children under 13—to their detriment.

328.    Defendant willfully engaged in the unfair and unlawful acts described herein and knew or recklessly disregarded the fact that it violated Cal. Bus. & Prof. Code § 17200, *et seq.*

329.    A.C., A.F., and members of the California class were harmed by Defendant's practices described herein, which were a substantial factor and caused injury in fact and actual damages to A.C., A.F., and members of the California class.

330.    As a direct and proximate result of Defendant's unfair and unlawful acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.,* A.C., A.F., and members of the California class have suffered and will continue to suffer an ascertainable loss of money or property, real or personal, and monetary and non-monetary damages, as described herein, including, *inter alia,* the loss of the value and/or diminishment in value of their Personal Information and the loss of the ability to control the use of their Personal Information.

331.    As outlined herein, there is tangible value in the Personal Information of A.C., A.F., and members of the California class. A.C., A.F., and members of the California class have lost the opportunity to receive value in exchange for their Personal Information.

---

[114] See 16 C.F.R. § 312.1 (COPPA "prohibits unfair or deceptive acts or practices in connection with the collection, use, and/or disclosure or personal information from and about children on the internet.").

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

332.    Defendant's monetization of the Personal Information of A.C., A.F., and members of the California class demonstrates that there is a market for their Personal Information.

333.    The Personal Information of A.C., A.F., and members of the California Class is now in the possession of Defendant, who has used and will use it for its financial gain.

334.    Defendant's retention of the Personal Information of A.C., A.F., and members of the California class presents a continuing risk to them as well as the general public. A.C., A.F., and members of the California class seek relief for the injuries they have suffered as a result of Defendant's unfair and unlawful acts and practices, as provided by Cal. Bus. & Prof. Code § 17200, *et seq.* and applicable law, including all actual damages and attorneys' fees and costs, treble damages, statutory damages, and restitution, as well as an injunction requiring Defendant to permanently delete, destroy or otherwise sequester the Personal Information collected without parental consent, requiring Defendant to provide a complete audit and accounting of the uses of the Personal Information by them and any other third parties, and other appropriate injunctive and/or declaratory relief.

## CLAIM 5

### CALIFORNIA UNJUST ENRICHMENT

### (Brought on behalf of Plaintiff A.C. and A.F. and the California Class)

335.    Plaintiff A.C., A.F., and members of the California class incorporate the foregoing allegations as if fully set forth herein.

336.    By virtue of the unlawful, unfair, and deceptive conduct alleged herein, Defendant has realized millions of dollars in revenue from its collection and use of the Personal Information of the A.C., A.F., and members of the California class.

337.    Defendant's ill-gotten gains were monetary benefits conferred upon Defendant by the A.C., A.F., and members of the California class. It would be inequitable and unjust to permit Defendant to retain the economic benefits it has obtained through advertising and commercialization derived from the Personal Information of A.C., A.F., and members of the California class.

338.    Defendant will be unjustly enriched if it is permitted to retain the economic benefits conferred upon it by the A.C., A.F., and members of the California class its unlawful, unfair, unauthorized, and impermissible use of the Personal Information of A.C., A.F.,  and members of the California class. Allowing Defendant to retain the profits from its unlawful, unauthorized, and impermissible use of the Personal Information of A.C., A.F., and members of the California class would be unjust and contrary to public policy.

339.    A.C., A.F., members of the California Class are therefore entitled to recover the amounts realized by the Defendant at the expense of A.C., A.F., and members of the California class.

340.    A.C., A.F., and members of the California class do not seek recover in this claim for their own economic harm and have no adequate remedy at law that would divest Defendant of its ill-gotten and unjust profits.

341.    To the extent that money damages, if available, would constitute an adequate remedy at law barring recovery under this claim, A.C., A.F.,  and members of the California class assert their claim for non-restitutionary disgorgement as an alternative remedy.

342.    A.C., A.F., and members of the California class are entitled to non-restitutionary disgorgement of Defendant's ill-gotten gains, and/or the imposition of a constructive trust to recover the amount of Defendant's ill-gotten gains.

## <u>CLAIM 6</u>

### ILLINOIS INTRUSION UPON SECLUSION

### (Brought on behalf of Plaintiff A.A. and A.B. and the Illinois Class)

343.    Plaintiffs A.A. and A.B. and members of the Illinois Class re-allege the foregoing allegations as if fully set forth herein.

344.    A.A., A.B., and members of the Illinois Class's private affairs, concerns, and seclusion includes their interest in their Personal Information as defined by COPPA, which includes data points concerning their location and online activity while using internet-connected devices.

345.    Defendant intentionally intruded upon the private affairs, concerns, and seclusion of A.A., A.B., and members of the Illinois Class by improperly accessing their Personal Information

and using it for improper purposes, including by targeting A.A., A.B., and members of the Illinois Class with behavioral advertising that would be highly offensive to a reasonable person, constituting an egregious breach of social norms and/or enabling the targeting of A.A., A.B., and members of the Illinois Class with such advertisements, as detailed herein.

346.    Defendant's intrusions upon the private affairs, concerns, and seclusion of A.A., A.B., and members of the Illinois class were substantial, and would be highly offensive to a reasonable person, constituting an egregious breach of social norms, as is evidenced by countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, scholarly literature on consumers' reasonable expectations.

347.    As minor children, A.A., A.B., and members of the Illinois class lacked the ability to form expectations about reasonable privacy or to consent to Defendant's actions.

348.    Neither A.A., A.B., members of the Illinois class, nor their parents and/or guardians consented to Defendant's intrusions upon their private affairs, concerns, and seclusions.

349.    A.A., A.B., and members of the Illinois class suffered actual and concrete injury as a result of Defendant's intrusions upon A.A., A.B., and Illinois class members' private affairs, concerns, and seclusion.

350.    A.A., A.B., and members of the Illinois class seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Defendant's invasions of privacy, as well as disgorgement of profits made by Defendant as a result of their intrusions upon A.A., A.B., and members of the Illinois class's private affairs, concerns, and seclusion.

**CLAIM 7**

**ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT,**

**815 Ill. Comp. Stat. Ann. 505/2 *et seq.***

**(Brought on behalf of Plaintiff A.A. and A.B. and the Illinois Class)**

351.    Plaintiffs A.A. and A.B. and members of the Illinois Class re-allege the foregoing allegations as if fully set forth herein.

352.    A.A., A.B., and members of the Illinois Class are or were residents of Illinois and/or viewed child-directed content in Illinois hosted and/or created by Defendant.

353.    At all times mentioned herein, Defendant engaged in "trade" or "commerce" in Illinois in that Defendant each engaged in the advertising, offering for sale, sale, and distribution of property or any other articles, commodities, or things of value in Illinois.

354.    Defendant engaged in consumer-oriented acts through the offering, promoting, and/or distributing of Roku and child-directed content hosted thereon, which significantly impacted the public because Roku is used nationwide, including in Illinois, and there are millions of users, including A.A., A.B., and members of the Illinois Class.

355.    815 Ill. Comp. Stat. Ann. 505/2 provides "[u]nfair methods of competition and unfair … acts or practices … in the conduct of any trade or commerce are hereby declared unlawful."

356.    The act further provides: "In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act." 815 Ill. Comp. Stat. Ann. 505/2.

357.    Defendant violated 815 Ill. Comp. Stat. Ann. 505/2 by engaging in the unfair acts or practices proscribed by 815 Ill. Comp. Stat. Ann. 505/2 outlined herein.

358.    Defendant at all relevant times knowingly violated legal duties and public policy by unfairly and unlawfully collecting the Personal Information of children under 13 and tracking, profiling, and targeting those children for Defendant's commercial financial gain.

359.    As outlined herein, Defendant at all times had actual knowledge of its own noncompliance with COPPA and other applicable privacy-related laws. Further, Defendant at all

times had actual knowledge of its own collection of the Personal Information from A.A., A.B., and members of the Illinois class, and the tracking, profiling, and targeting of those children.

360.    The inherent characteristics, content, and features of Roku as designed by Defendant, including the names, designs, cartoon elements, children's themes, and children's songs, evince that Defendant hosted child-directed content. That is, Roku was plainly intended for and meant to attract children under 13, collect the Personal Information of those children, and serve those children behavioral advertising for substantial commercial gain.

361.    Defendant systematically collected, used, and/or disclosed Personal Information from children under 13 in violation of COPPA, and therefore the FTC Act, to serve them targeted, behavioral advertising by inter alia:

    a.    Failing to provide sufficient notice of the information Defendant collected, or the information that was collected on Defendant's behalf, online from children under 13, how Defendant used such information, its disclosure practices, and all other required content, in violation of Section 312.4(d) of COPPA, 16 C.F.R. § 312.4(d);

    b.    Failing to provide direct notice to parents of the information Defendant collected, or the information that was collected on Defendant's behalf, online from children under 13, how Defendant used such information, its disclosure practices, and all other required content, in violation of Section 312.4(b) and (c) of COPPA, 16 C.F.R. § 312.4(b)-(c);

    c.    Failing to obtain verifiable parental consent before any collection or use of Personal Information from children under 13, in violation of Section 312.5 of COPPA, 16 C.F.R. § 312.5; and

    d.    Failing to establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of Personal Information collected from children under 13, in violation of Section 312.8 of COPPA, 16 C.F.R. § 312.8.

362.    Violations of COPPA and the accompanying FTC regulations "shall be treated as a violation of a rule defining an unfair … act or practice prescribed under 15 U.S.C. § 57a(a)(1)(B)."

15 U.S.C. § 6502(c).  These rules define unfair acts or practices in or affecting commerce within the meaning of 15 U.S.C. § 45(a)(1), which is the model for the various consumer protection statutes in the several states, including the 815 Ill. Comp. Stat. Ann. 505/2 et seq.[115]

363.    Accordingly, Defendant engaged in unfair and unlawful trade acts or practices in violation of 815 Ill. Comp. Stat. Ann. 505/2 et seq., which is modeled after, proscribes the same conduct as, and gives deference to the definitions of the FTC Act.

364.    Defendant's conduct is unfair, immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, and there are no greater countervailing benefits to consumers or competition.  Further, A.A., A.B., and members of the Illinois Class could not have reasonably avoided injury because Defendant took advantage of the lack of knowledge, ability, experience, and/or capacity of consumers—in this case children under 13—to their detriment.

365.    Defendant willfully engaged in the unfair and unlawful acts described herein and knew or recklessly disregarded the fact that they violated 815 Ill. Comp. Stat. Ann. 505/2 et seq.

366.    A.A., A.B., and members of the Illinois class were harmed by Defendant's practices described herein, which were a substantial factor and caused injury in fact and actual damages to A.A., A.B., and members of the Illinois class.

367.    As a direct and proximate result of Defendant's unfair and unlawful acts and practices in violation of 815 Ill. Comp. Stat. Ann. 505/2 *et seq.,* A.A., A.B., and members of the Illinois class have suffered and will continue to suffer an ascertainable loss of money or property, real or personal, and monetary and non-monetary damages, as described herein, including, inter alia, the loss of the value and/or diminishment in value of their Personal Information and the loss of the ability to control the use of their Personal Information.

---

[115] *See* 16 C.F.R. § 312.1 (COPPA "prohibits unfair or deceptive acts or practices in connection with the collection, use, and/or disclosure or personal information from and about children on the internet.").

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

368.    As outlined herein, there is tangible value in A.A., A.B., and members of the Illinois class's Personal Information. A.A., A.B., and members of the Illinois class have lost the opportunity to receive value in exchange for their Personal Information.

369.    Defendant's monetization of A.A., A.B., and members of the Illinois class's Personal Information demonstrates that there is a market for their Personal Information.

370.    A.A., A.B., and members of the Illinois class's Personal Information is now in the possession of Defendant, who have used and will use it for their financial gain.

371.    Defendant's retention of A.A., A.B., and members of the Illinois class's Personal Information presents a continuing risk to them as well as the general public. A.A., A.B., and members of the Illinois class seek relief for the injuries they have suffered as a result of Defendant's unfair and unlawful acts and practices, as provided by 815 Ill. Comp. Stat. Ann. 505/2 et seq. and applicable law, including all actual damages and attorneys' fees and costs, treble damages, statutory damages, and restitution, as well as an injunction requiring Defendant to each permanently delete, destroy or otherwise sequester the Personal Information collected without parental consent, requiring Defendant to provide a complete audit and accounting of the uses of the Personal Information by them and any other third parties, and other appropriate injunctive and/or declaratory relief.

## **CLAIM 8**

### **ILLINOIS UNJUST ENRICHMENT**

**(Brought on behalf of Plaintiff A.A. and A.B. and the Illinois Class)**

372.    Plaintiffs A.A. and A.B. and members of the Illinois class re-allege the foregoing allegations as if fully set forth herein.

373.    By virtue of the unlawful and unfair conduct alleged herein, Defendant has realized millions of dollars in revenue from its collection and use of the Personal Information of A.A., A.B., and Illinois class members through behavioral advertising and commercialization purposes derived from that Personal Information.

374.     Defendant's ill-gotten gains were monetary benefits conferred upon Defendant by A.A., A.B., and members of the Illinois class. It would be inequitable and unjust to permit Defendant to retain the economic benefits it has obtained through advertising and commercialization derived from the Personal Information of A.A., A.B., and members of the Illinois class.

375.     Defendant is liable because it profited from the conduct alleged.

376.     Defendant will be unjustly enriched if it is permitted to retain the economic benefits conferred upon them by A.A., A.B., and members of the Illinois class through Defendant's unlawful, unfair, unauthorized, and impermissible use of the Personal Information of A.A., A.B., and members of the Illinois class, and allowing Defendant to retain the profits from its unlawful, unfair, unauthorized, and impermissible use of the Personal Information of A.A., A.B., and members of the Illinois class would be unjust and contrary to public policy.

377.     A.A., A.B., and members of the Illinois class are therefore entitled to recover the amounts realized by Defendant at the expense of A.A., A.B., and members of the Illinois class.

378.     A.A., A.B., and members of the Illinois class do not seek recovery in this claim for their own economic harm and have no adequate remedy at law that would divest Defendant of its ill-gotten and unjust profits.

379.     However, to the extent that money damages, if available, would constitute an adequate remedy at law barring recovery under this claim, A.A., A.B., and members of the Illinois class assert their claim for non-restitutionary disgorgement as an alternative remedy pending a final determination of the availability of a remedy at law.

380.     A.A., A.B., and members of the Illinois class are entitled to non-restitutionary disgorgement of Defendant's ill-gotten gains, and/or the imposition of a constructive trust to recover the amount of Defendant's ill-gotten gains.

## CLAIM 9

### NEVADA INTRUSION UPON SECLUSION

### (Brought on behalf of Plaintiff A.E. and the Nevada Class)

381.    Plaintiff A.E. and members of the Nevada class re-allege the foregoing allegations as if fully set forth herein.

382.    The private affairs, concerns, and seclusion of A.E. and members of the Nevada Class includes their interest in their Personal Information as defined by COPPA, which includes data points concerning their location and online activity while using internet-connected devices.

383.    Defendant intentionally intruded upon the private affairs, concerns, and seclusion of A.E. and members of the Nevada class by improperly accessing A.E.  and members of the Nevada class's Personal Information and using it for improper purposes, including by targeting A.E. and members of the Nevada class with behavioral advertising that would be highly offensive to a reasonable person, constituting an egregious breach of social norms and/or enabling the targeting of A.E. and members of the Nevada class with such advertisements, as detailed herein.

384.    Defendant's intrusions upon the private affairs, concerns, and seclusion of A.E. and members of the Nevada class were substantial, and would be highly offensive to a reasonable person, constituting an egregious breach of social norms, as is evidenced by countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, and scholarly literature on consumers' reasonable expectations.

385.    As children aged 13 or younger, A.E. and members of the Nevada class lacked the ability to form expectations about reasonable privacy or to consent to Defendant's actions.

386.    Neither A.E. and members of the Nevada class, nor their parents and/or guardians consented to Defendant's intrusions upon their private affairs, concerns, and seclusions.

387.    A.E. and members of the Nevada class suffered actual and concrete injury as a result of Defendant's intrusions upon A.E. and members of the Nevada class's private affairs, concerns, and seclusion.

388.    A.E. and members of the Nevada class seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate A.E. and members of the Nevada class for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Defendant's invasion of privacy, as well as disgorgement of profits made by Defendant as a result of its intrusions upon A.E. and members of the Nevada class's private affairs, concerns, and seclusion.

## CLAIM 10

### NEVADA TRADE REGULATION AND PRACTICES ACT (NTRPA),

### Nev. Rev. Stat. § 598.0903, *et seq.*

### (Brought on behalf of Plaintiff A.E. and the Nevada Subclass)

389.    Plaintiff A.E. and members of the Nevada Class re-allege the foregoing allegations as if fully set forth herein.

390.    A.E. and members of the Nevada Class are or were residents of Nevada and/or viewed child-directed content in Nevada hosted and/or created by Defendant.

391.    Defendant is a "person" within the meaning of Nev. Rev. Stat. 598.0915.

392.    Under the NTRPA, "[a] person engages in a 'deceptive trade practice' when in the course of [that person's] business or occupation [they] knowingly:"

    a.    fails to disclose a material fact in connection with the sale or lease of goods or services, Nev. Rev. Stat. § 598.0923(1)(b);

    b.    violates a state or federal statute or regulation relating to the sale or lease of goods or services, Nev. Rev. Stat. § 598.0923(1)(c); and/or

    c.    uses an unconscionable practice in a transaction, Nev. Rev. Stat. § 598.0923(1)(e).

393.    Defendant failed to disclose material facts about its collection, retention, use, and disclosure of the Personal Information of children under 13 and did so in violation of state federal statutes and regulations, including COPPA.

394.    As discussed above, Defendant systematically collected, used, and/or disclosed Personal Information from children under 13 in violation of COPPA, and therefore the FTC Act, to serve them targeted, behavioral advertising by *inter alia*:

    a.  Failing to provide sufficient notice of the information Defendant collected, or the information that was collected on Defendant's behalf, online from children under 13, how Defendant used such information, their disclosure practices, and all other required content, in violation of Section 312.4(d) of COPPA, 16 C.F.R. § 312.4(d);

    b.  Failing to provide direct notice to parents of the information Defendant collected, or the information that was collected on Defendant's behalf, online from children under 13, how Defendant used such information, their disclosure practices, and all other required content, in violation of Section 312.4(b) and (c) of COPPA, 16 C.F.R. § 312.4(b)-(c);

    c.  Failing to obtain verifiable parental consent before any collection or use of Personal Information from children under 13, in violation of Section 312.5 of COPPA, 16 C.F.R. § 312.5; and

    d.  Failing to establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of Personal Information collected from children under 13, in violation of Section 312.8 of COPPA, 16 C.F.R. § 312.8.

395.    Violations of COPPA and the accompanying FTC regulations "shall be treated as a violation of a rule defining an unfair or deceptive act or practice prescribed under 15 U.S.C. § 57a(a)(1)(B)." 15 U.S.C. § 6502(c).  These rules define unfair acts or practices in or affecting

commerce within the meaning of 15 U.S.C. § 45(a)(1), which is the model for the various consumer protection statutes in the several states.[116]

396.    Defendant willfully and purposefully engaged in the deceptive acts and practices as defined by Nev. Rev. Stat. § 598.0923, described herein.

397.    Defendant at all relevant times knowingly violated legal duties and public policy by unfairly, deceptively, and unlawfully collecting the Personal Information of children under 13 and tracking, profiling, and targeting those children with behavioral advertising for Defendant's commercial financial gain.

398.    As outlined herein, Defendant at all times had actual knowledge of its non-compliance with COPPA and other applicable privacy-related laws. Further, Defendant at all times had actual knowledge of its collection of the Personal Information from A.E. and members of the Nevada Class and the tracking, profiling, and targeting of those children for lucrative behavioral advertising.

399.    As outlined herein, Defendant intentionally designed the Roku platform to, among other things, attract children under 13 by making child-directed content available to them so that Roku could collect the Personal Information of those children under 13 and serve them with lucrative, intrusive, behavioral advertising for substantial commercial gain.

400.    The inherent characteristics, content, and features of Roku, including the names, designs, cartoon elements, children's themes, and children's songs, evince that Roku hosted child-directed content. That is, Roku was plainly intended for and meant to attract children under 13, collect the Personal Information of those children, and serve those children behavioral advertising for substantial commercial gain.

401.    Additionally, through its conduct, Defendant engaged in an "unconscionable practice" within the meaning of NTRPA because Defendant took "advantage of the lack of

---

[116] *See* 16 C.F.R. § 312.1 (COPPA "prohibits unfair or deceptive acts or practices in connection with the collection, use, and/or disclosure or personal information from and about children on the internet.").

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

knowledge, ability, experience or capacity of the consumer," including children under the age of 13, "to a grossly unfair degree" and "to the detriment of the consumer." Nev. Rev. Stat. § 598.0923(2)(b).

402.    Defendant's conduct is unfair, immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, and there are no greater countervailing benefits to consumers or competition. Further, A.E. and members of the Nevada class could not have reasonably avoided injury because Defendant took advantage of the lack of knowledge, ability, experience, and/or capacity of consumers—in this case children under 13—to their detriment.

403.    Defendant willfully engaged in the unfair and unlawful acts described herein and knew or recklessly disregarded the fact that it violated the NTRPA.

404.    A.E. and members of the Nevada class were harmed by Defendant's practices described herein, which were a substantial factor and caused injury in fact and actual damages to A.E. and members of the Nevada class.

405.    As a direct and proximate result of Defendant's unfair and unlawful acts and practices in violation of NTRPA, A.E. and members of the Nevada class have suffered and will continue to suffer an ascertainable loss of money or property, real or personal, and monetary and non-monetary damages, as described herein, including, inter alia, the loss of the value and/or diminishment in value of their Personal Information and the loss of the ability to control the use of their Personal Information.

406.    As outlined herein, there is tangible value in the Personal Information of A.E. and members of the Nevada class. A.E. and members of the Nevada class have lost the opportunity to receive value in exchange for their Personal Information.

407.    Defendant's monetization of A.E. and members of the Nevada class's Personal Information demonstrates that there is a market for their Personal Information.

408.    A.E. and Nevada class members' Personal Information is now in the possession of Defendant, who has used and will use it for its financial gain.

409.    Defendant's retention of A.E. and members of the Nevada class's Personal Information presents a continuing risk to them as well as the general public. A.E. and members of the Nevada class seek relief for the injuries they have suffered as a result of Defendant's unfair and unlawful acts and practices, as provided by NTRPA and applicable law, including all actual damages and attorneys' fees and costs, treble damages, statutory damages, and restitution, as well as an injunction requiring Defendant to permanently delete, destroy or otherwise sequester the Personal Information collected without parental consent, requiring Defendant to provide a complete audit and accounting of the uses of the Personal Information by Defendant and any other third parties, and other appropriate injunctive and/or declaratory relief.

410.    After finding that Defendant has engaged in a deceptive trade practice directed toward a minor person, the court "may, in addition to any other civil or criminal penalty, impose a civil penalty of not more than $25,000 for each violation." Nev. Rev. Stat. § 598.09735. Because Defendant's conduct directed toward minors, Plaintiffs and members of the Class seek the imposition of such civil penalty.

## CLAIM 11

### NEVADA UNJUST ENRICHMENT

### (Brought on behalf of Plaintiff A.E. and the Illinois Class)

411.    Plaintiff A.E. and members of the Nevada class re-allege the foregoing allegations as if fully set forth herein.

412.    By virtue of the unlawful and unfair conduct alleged herein, Defendant has realized millions of dollars in revenue from its collection and use of the Personal Information of A.E. and members of the Nevada Class through behavioral advertising and commercialization purposes derived from that Personal Information.

413.    Defendant's ill-gotten gains were monetary benefits conferred upon Defendant by A.E. and members of the Illinois Class. It would be inequitable and unjust to permit Defendant to retain the economic benefits it has obtained through advertising and commercialization derived from the Personal Information of A.E. and members of the Nevada Class.

414.    Defendant is liable because it profited from the conduct alleged.

415.    Defendant will be unjustly enriched if it is permitted to retain the economic benefits conferred upon them by A.E. and members of the Nevada Class through Defendant's unlawful, unfair, unauthorized, and impermissible use of the Personal Information of A.E. and members of the Nevada Class, and allowing Defendant to retain the profits from its unlawful, unfair, unauthorized, and impermissible use of the Personal Information of A.E. and members of the Nevada Class would be unjust and contrary to public policy.

416.    A.E. and members of the Nevada Class are therefore entitled to recover the amounts realized by Defendant at the expense of A.E. and members of the Nevada Class.

417.    A.E. and members of the Nevada Class do not seek recovery in this claim for their own economic harm and have no adequate remedy at law that would divest Defendant of its ill-gotten and unjust profits.

418.    However, to the extent that money damages, if available, would constitute an adequate remedy at law barring recovery under this claim, A.E. and members of the Nevada Class assert their claim for non-restitutionary disgorgement as an alternative remedy pending a final determination of the availability of a remedy at law.

419.    A.E. and members of the Nevada Class are entitled to non-restitutionary disgorgement of Defendant's ill-gotten gains, and/or the imposition of a constructive trust to recover the amount of Defendant's ill-gotten gains

<u>**CLAIM 12**</u>

**NEW JERSEY INTRUSION UPON SECLUSION**

**(Brought on behalf of Plaintiff A.D. and the New Jersey Class)**

420.    Plaintiff A.D. and members of the New Jersey class re-allege the foregoing allegations as if fully set forth herein.

421.    The private affairs, concerns, and seclusion of A.D. and members of the New Jersey Class includes their interest in their Personal Information as defined by COPPA, which includes data points concerning their location and online activity while using internet-connected devices.

422.    Defendant intentionally intruded upon the private affairs, concerns, and seclusion of A.D. and members of the New Jersey class by improperly accessing A.D. and members of the New Jersey class's Personal Information and using it for improper purposes, including by targeting A.D. and members of the New Jersey class with behavioral advertising that would be highly offensive to a reasonable person, constituting an egregious breach of social norms and/or enabling the targeting of A.D. and members of the New Jersey class with such advertisements, as detailed herein.

423.    Defendant's intrusions upon the private affairs, concerns, and seclusion of A.D. and members of the New Jersey class were substantial, and would be highly offensive to a reasonable person, constituting an egregious breach of social norms, as is evidenced by countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, and scholarly literature on consumers' reasonable expectations.

424.    As children aged 13 or younger, A.D. and members of the New Jersey class lacked the ability to form expectations about reasonable privacy or to consent to Defendant's actions.

425.    Neither A.D. members of the New Jersey class, nor their parents and/or guardians consented to Defendant's intrusions upon their private affairs, concerns, and seclusions.

426.    A.D. and members of the New Jersey class suffered actual and concrete injury as a result of Defendant's intrusions upon A.D. and members of the New Jersey class's private affairs, concerns, and seclusion.

427.    A.D. and members of the New Jersey class seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate A.D. and members of the New Jersey class for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Defendant's invasion of privacy, as well as disgorgement of profits made by Defendant as a result of its intrusions upon A.D. and members of the New Jersey class's private affairs, concerns, and seclusion.

**CLAIM 13**

**NEW JERSEY CONSUMER FRAUD ACT,**

**N.J. Stat. Ann. § 56:8-1, et. seq. (NJCFA)**

**(Brought on behalf of Plaintiff A.D. and the New York Class)**

428.    A.D. and members of the New Jersey Class re-allege the foregoing allegations as if fully set forth herein.

429.    Defendant is a person within the meaning of N.J. Stat. Ann. § 56:8-1(d).

430.    The New Jersey Consumer Fraud Act ("NJCFA") prohibits any "act, use or employment by any person of any unconscionable commercial practice … in connection with the sale or advertisement of any merchandise." See N.J. Stat. § 56:8-2.

431.    Roku, the channels available on the Roku platform, and the advertisements placed on each channel constitute "merchandise" pursuant to § 56:8-1(c), because they constitute commodities or services offered directly or indirectly to the public for sale.

432.    Defendant offered Roku for "sale" to A.D. and members of the New Jersey Class within the meaning of N.J. Stat. Ann. § 56:8-1(e) because it attempted directly or indirectly to sell advertised products or services to Roku users.

433.    Defendant willfully and purposefully engaged in unconscionable and unfair acts and practices in connection with the sale of the merchandise as defined by N.J. Stat. § 56:8-1(c) in violation of N.J. Stat. § 56:8-2 as described herein.

434.    Defendant at all relevant times knowingly violated legal duties and public policy by unfairly and unlawfully collecting the Personal Information of children under 13 and tracking, profiling, and targeting those children with behavioral advertising for Defendant's commercial financial gain.

435.    As outlined herein, Defendant at all times had actual knowledge of its non-compliance with COPPA and other applicable privacy-related laws. Further, Defendant at all times had actual knowledge of its collection of the Personal Information from A.D. and members of the

New Jersey Class and the tracking, profiling, and targeting of those children for lucrative behavioral advertising.

436.    As outlined herein, Defendant intentionally designed the Roku platform to, among other things, attract children under 13 by making child-directed content available to them so that Roku could collect the Personal Information of those children under 13 and serve them with lucrative, intrusive, behavioral advertising for substantial commercial gain.

437.    The inherent characteristics, content, and features of Roku, including the names, designs, cartoon elements, children's themes, and children's songs, evince that Roku hosted child-directed content. That is, Roku was plainly intended for and meant to attract children under 13, collect the Personal Information of those children, and serve those children behavioral advertising for substantial commercial gain.

438.    Defendant systematically collected, used, and/or disclosed Personal Information from children under 13 in violation of COPPA, and therefore the FTC Act, to serve them targeted, behavioral advertising by inter alia:

    a.  Failing to provide sufficient notice of the information Defendant collected, or the information that was collected on Defendant's behalf, online from children under 13, how Defendant used such information, their disclosure practices, and all other required content, in violation of Section 312.4(d) of COPPA, 16 C.F.R. § 312.4(d);

    b.  Failing to provide direct notice to parents of the information Defendant collected, or the information that was collected on Defendant's behalf, online from children under 13, how Defendant used such information, their disclosure practices, and all other required content, in violation of Section 312.4(b) and (c) of COPPA, 16 C.F.R. § 312.4(b)-(c);

    c.  Failing to obtain verifiable parental consent before any collection or use of Personal Information from children under 13, in violation of Section 312.5 of COPPA, 16 C.F.R. § 312.5; and

d.  Failing to establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of Personal Information collected from children under 13, in violation of Section 312.8 of COPPA, 16 C.F.R. § 312.8.

439.    Violations of COPPA and the accompanying FTC regulations "shall be treated as a violation of a rule defining an unfair … act or practice prescribed under 15 U.S.C. § 57a(a)(1)(B)." 15 U.S.C. § 6502(c).  These rules define unfair acts or practices in or affecting commerce within the meaning of 15 U.S.C. § 45(a)(1), which is the model for the various consumer protection statutes in the several states, including the NJCFA.[117]

440.    Accordingly, Defendant engaged in unfair and unlawful trade acts or practices in violation of NJCFA, which is modeled after, proscribes the same conduct as, and/or gives deference to the definitions of the FTC Act.

441.    Defendant's conduct is unfair, immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, and there are no greater countervailing benefits to consumers or competition. Further, A.D. and members of the New Jersey class could not have reasonably avoided injury because Defendant took advantage of the lack of knowledge, ability, experience, and/or capacity of consumers—in this case children under 13—to their detriment.

442.    Defendant willfully engaged in the unfair and unlawful acts described herein and knew or recklessly disregarded the fact that it violated the NJCFA.

443.    A.D. and members of the New Jersey class were harmed by Defendant's practices described herein, which were a substantial factor and caused injury in fact and actual damages to J.A.E., J.R.E., and members of the New Jersey class.

444.    As a direct and proximate result of Defendant's unfair and unlawful acts and practices in violation of NJCFA, J.A.E., J.R.E., and members of the New Jersey class have suffered and will continue to suffer an ascertainable loss of money or property, real or personal, and monetary

---

[117] *See* 16 C.F.R. § 312.1 (COPPA "prohibits unfair or deceptive acts or practices in connection with the collection, use, and/or disclosure or personal information from and about children on the internet.").

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

and non-monetary damages, as described herein, including, inter alia, the loss of the value and/or diminishment in value of their Personal Information and the loss of the ability to control the use of their Personal Information.

445.    As outlined herein, there is tangible value in the Personal Information of A.D. and members of the New Jersey class. A.D. and members of the New Jersey class have lost the opportunity to receive value in exchange for their Personal Information.

446.    Defendant's monetization of J.A.E., J.R.E., and members of the New Jersey class's Personal Information demonstrates that there is a market for their Personal Information.

447.    A.D. and New Jersey class members' Personal Information is now in the possession of Defendant, who has used and will use it for its financial gain.

448.    Defendant's retention of J.A.E., J.R.E., and members of the New Jersey class's Personal Information presents a continuing risk to them as well as the general public. J.A.E., J.R.E., and members of the New Jersey class seek relief for the injuries they have suffered as a result of Defendant's unfair and unlawful acts and practices, as provided by NJCFA and applicable law, including all actual damages and attorneys' fees and costs, treble damages, statutory damages, and restitution, as well as an injunction requiring Defendant to permanently delete, destroy or otherwise sequester the Personal Information collected without parental consent, requiring Defendant to provide a complete audit and accounting of the uses of the Personal Information by Defendant and any other third parties, and other appropriate injunctive and/or declaratory relief.

## CLAIM 14

### NEW JERSEY UNJUST ENRICHMENT

**(Brought on behalf of Plaintiffs A.D. and members of the New Jersey Class)**

449.    A.D. and members of the New Jersey Class re-allege the foregoing allegations as if fully set forth herein.

450.    By virtue of the unlawful and unfair conduct alleged herein, Defendant has realized millions of dollars in revenue from their collection and use of the Personal Information of A.D. and

members of the New Jersey Class through behavioral advertising and commercialization purposes derived from that Personal Information.

451.    Defendant's ill-gotten gains were monetary benefits conferred upon Defendant by A.D. and members of the New Jersey Class.  It would be inequitable and unjust to permit any of the Defendant to retain the economic benefits it has obtained through advertising and commercialization derived from the Personal Information of A.D. and members of the New Jersey class.

452.    Defendant is liable because it profited from the conduct alleged.

453.    Defendant will be unjustly enriched if it is permitted to retain the economic benefits conferred upon it by A.D. and members of the New Jersey Class through Defendant's unlawful, unfair, unauthorized, and impermissible use of the Personal Information of A.D. and members of the New Jersey class. Allowing Defendant to retain the profits from its unlawful, unfair, unauthorized, and impermissible use of the Personal Information of A.D. and members of the New Jersey class would be unjust and contrary to public policy.

454.    A.D. and members of the New Jersey class are therefore entitled to recover the amounts realized by Defendant at the expense of A.D. and members of the New Jersey class.

455.    A.D. and members of the New Jersey class do not seek recovery in this claim for their own economic harm and have no adequate remedy at law that would divest Defendant of its ill-gotten and unjust profits. However, to the extent that money damages, if available, would constitute an adequate remedy at law barring recovery under this claim, A.D. and members of the New Jersey class assert their claim for non-restitutionary disgorgement as an alternative remedy pending a final determination of the availability of a remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of themselves and the proposed Classes, respectfully request relief as follows:

A.    An order certifying this action as a class action, and certifying the Classes defined herein, designating Plaintiffs, as described above, as the representatives of the

respective Classes defined herein, and appointing Plaintiffs' counsel as counsel for the Classes;

B.  An order declaring that Defendant's actions, as described above constitute: (i) a violation of the Video Privacy Protection Act, 18 U.S.C. § 2710; (ii) breaches of the common law claims of intrusion upon seclusion set forth above; (ii) violations of the state consumer protection statutes set forth above; (iii) a violation of the right to privacy under the California Constitution, Article I, Section 1; and (iv) unjust enrichment of Defendant as a result of its actions.

C.  A judgment awarding Plaintiffs and the members of the Classes appropriate relief, including actual, compensatory, and/or statutory damages, and punitive damages (as permitted by law), in an amount to be determined at trial;

D.  A judgment awarding any and all equitable, injunctive, and declaratory relief as may be appropriate, including orders of disgorgement of Defendant's unlawful gains, and restitution;

E.  A judgment awarding injunctive relief as set forth above, non-restitutionary disgorgement of profits and unlawful gains, and any other equitable relief that the Court may deem proper;

F.  A judgment awarding all costs, including experts' fees, attorneys' fees, and the costs of prosecuting this action, and other relief as permitted by law;

G.  Pre-judgment and post-judgment interest, as permitted by law; and

H.  Grant such other legal and equitable relief as the Court may deem appropriate.

## **DEMAND FOR A JURY TRIAL**

Plaintiffs demand a trial by jury for all issues so triable.

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL

Dated: July 25, 2025                          Respectfully submitted,


                                              */s/ Patrick Carey*
                                              Mark Todzo, (Bar No. 168389)
                                              Patrick Carey, (Bar No. 308623)
                                              **LEXINGTON LAW GROUP, LLP**
                                              503 Divisadero Street
                                              San Francisco, CA 94117
                                              Telephone: 415-913-7800
                                              pcarey@lexlawgroup.com
                                              mtodzo@lexlawgroup.com

                                              David S. Golub (pro hac vice forthcoming)
                                              Ian W. Sloss (pro hac vice forthcoming)
                                              Steven Bloch (pro hac vice forthcoming)
                                              Johnathan Seredynski (pro hac vice
                                              forthcoming)
                                              Jennifer Sclar (pro hac vice forthcoming)
                                              **SILVER GOLUB & TEITELL LLP**
                                              One Landmark Square, 15th Floor
                                              Stamford, CT 06901
                                              Telephone: (203) 325-4491
                                              Facsimile: (203) 325-3769
                                              dgolub@sgtlaw.com
                                              isloss@sgtlaw.com
                                              sbloch@sgtlaw.com
                                              jseredynski@sgtlaw.com
                                              jsclar@sgtlaw.com

                                              *Attorneys for Plaintiffs and the Proposed
                                              Classes*

CLASS ACTION COMPLAINT – DEMAND FOR JURY TRIAL