**PERKINS COIE LLP**
Eric J. Weiss, *pro hac vice*
EWeiss@perkinscoie.com
Mallory A. Gitt, *pro hac vice*
MGitt@perkinscoie.com
1301 Second Avenue, Suite 4200
Seattle, Washington 98101-3804
Telephone: 206.359.8000
Facsimile: 206.359.9000

Lauren Trambley, Bar No. 340634
LTrambley@perkinscoie.com
505 Howard Street, Suite 1000
San Francisco, California 94105-3204
Telephone: 415.344.7000
Facsimile: 415.344.7050

**WILSON SONSINI GOODRICH & ROSATI**
Victor Jih, Bar No. 186515
vjih@wsgr.com
Kelly H. Yin, Bar No. 328380
kyin@wsgr.com
1900 Avenue of The Stars, 28th Floor
Los Angeles, CA 90067
Telephone: 424.446.6900
Facsimile: 866.974.7329

Dylan G. Savage, Bar No. 310452
dsavage@wsgr.com
1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022
Telephone: 212.999.5800
Facsimile: 866.974.7329

Attorneys for Defendant Roku, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

A.A., a minor, by and through their guardian ad Litem DEIDRE BOLIN; A.B., a minor, by and through their guardian ad Litem CARESS JOHNSON; A.C., a minor, by and through their guardian ad Litem GREGARY JOHNSON; A.D., a minor, by and through their guardian ad Litem TYLER LANGSOM; A.E., a minor, by and through their guardian ad Litem KEITH STRATTON; A.F., a minor, by and through their guardian ad Litem JACOB VANDERSMITTE, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

ROKU, INC.,

Defendant.

Case No. 5:25-cv-06284-NW

**DEFENDANT ROKU, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION**

Date: April 15, 2026
Time: 9:00 a.m.
Judge: Honorable Noël Wise
Crtm: 3
Flr: 5th

**NOTICE OF MOTION AND MOTION**

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT ON April 15, 2026, at 9:00 a.m., or as soon thereafter as the matter may be heard in in Courtroom 3, 5th Floor, United States District Court for the Northern District of California, 280 South First Street, San Jose, California, Roku, Inc. ("Roku") will move to compel arbitration. This Motion is made pursuant to the Federal Arbitration Act. 9 U.S.C. § 4.

This Motion is based on the Notice of Motion and Motion, the Memorandum of Points and Authorities, the Declaration of Julian Riediger in Support of Roku's Motion to Compel Arbitration and accompanying exhibits, other applicable portions of the record, and other argument that may be presented to the Court.

Dated: December 9, 2025

**PERKINS COIE LLP**

By: *s/ Eric J. Weiss*
Eric J. Weiss, *pro hac vice*
Mallory A. Gitt, *pro hac vice*
Lauren Trambley, Bar No. 340634

Attorneys for Defendant Roku, Inc.

## TABLE OF CONTENTS


I. INTRODUCTION ... 7

II. STATEMENT OF ISSUE TO BE DECIDED ... 8

III. BACKGROUND ... 8

A. Roku accountholders agree to mandatory arbitration. ... 8

B. Plaintiffs used their parents' Roku accounts to access Roku devices and services. ... 10

C. Plaintiffs filed a putative class action in court. ... 11

IV. LEGAL STANDARD ... 11

V. ARGUMENT ... 12

A. Valid agreements to arbitrate exist. ... 12

1. Courts routinely enforce clickwrap agreements like Roku's. ... 12

2. Plaintiffs' parents agreed to arbitrate disputes with Roku. ... 13

B. Well-established equitable doctrines require Plaintiffs to arbitrate. ... 14

1. Preexisting-relationship estoppel: Plaintiffs have a preexisting relationship with their parents, the Roku accountholders. ... 14

2. Direct-benefits estoppel: Plaintiffs received direct benefits by using their parents' accounts. ... 16

3. Intertwined-claims estoppel: Plaintiffs' claims are intertwined with their parents' agreements with Roku. ... 18

C. Equity and the FAA's policy compel the same result. ... 19

D. Arbitrability is delegated to the arbitrator. ... 19

1. The terms delegate arbitrability to the arbitrator. ... 20

2. Even if the terms did not delegate arbitrability, Plaintiffs' claims fall squarely within the agreements. ... 21

VI. CONCLUSION ... 22

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) .......... 7, 11, 19

*Atencio v. Bird Rides Inc.*,
2023 WL 8168955 (C.D. Cal. Nov. 3, 2023) .......... 17

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) .......... 12

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015) .......... 20, 21

*Broadnax v. Uber Techs., Inc.*,
790 F. Supp. 3d 996 (D. Nev. 2025) .......... 13

*Caremark, LLC v. Chickasaw Nation*,
43 F.4th 1021 (9th Cir. 2022) .......... 20

*Chan v. Charter Commc'ns Holding Co.*,
2015 WL 12655701 (C.D. Cal. Aug. 6, 2015) .......... 15, 16, 21

*Charles v. Portfolio Recovery Assocs., LLC*,
2024 WL 1672350 (9th Cir. Apr. 18, 2024) .......... 21

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
207 F.3d 1126 (9th Cir. 2000) .......... 11, 19

*Corn v. Kohl's Corp.*,
2025 WL 1785943 (N.D. Cal. June 9, 2025) .......... 16, 17

*Crowley Mar. Corp. v. Bos. Old Colony Ins. Co.*,
158 Cal. App. 4th 1061 (2008) .......... 15

*Droesch v. Wells Fargo Bank, N.A.*,
2021 WL 1817057 (N.D. Cal. May 6, 2021) .......... 11

*Elsasser v. DV Trading, LLC*,
444 F. Supp. 3d 916 (N.D. Ill. 2020) .......... 14, 17

*Erasmus v. LegalZoom.com, Inc.*,
2025 WL 1122237 (D.N.J. Apr. 15, 2025) .......... 13

*Facta Health, Inc. v. Pharmadent, LLC*,
2020 WL 5957619 (D.N.J. Oct. 8, 2020) .......... 16

*Ferguson v. Age of Learning, Inc.*,
2021 WL 4735736 (C.D. Cal. July 23, 2021) .......... 12

*Geraci v. Uber Techs., Inc.*,
2021 WL 5028368 (Del. Super. Ct. Oct. 29, 2021) .......... 12

*Gurler v. Westpac Surgical, LLC*,
2020 WL 10317436 (C.D. Cal. Dec. 11, 2020) .......... 14

*Haskins v. First Am. Title Ins. Co.*,
866 F. Supp. 2d 343 (D.N.J. 2012) .......... 14

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019) .......... 12, 19, 21

*Hirsch v. Amper Fin. Servs., LLC*,
71 A.3d 849 (N.J. 2013) .......... 17

*Hofer v. Emley*,
2019 WL 4575389 (N.D. Cal. Sept. 20, 2019) .......... 17

*Hopkins v. Dell Techs., Inc.*,
2023 WL 3791722 (S.D. Ill. June 2, 2023) .......... 12

*Ishimaru v. Fung*,
2005 WL 2899680 (Del. Ch. Oct. 26, 2005) .......... 14

*Knapke v. PeopleConnect, Inc.*,
38 F.4th 824 (9th Cir. 2022) .......... 22

*KPH Healthcare Servs., Inc. v. Janssen Biotech, Inc.*,
2021 WL 4739601 (D.N.J. Oct. 12, 2021) .......... 18

*Montoya v. Comcast Corp.*,
2016 WL 5340651 (E.D. Cal. Sept. 23, 2016) .......... 18

*Motise v. America Online, Inc.*,
346 F. Supp. 2d 563 (S.D.N.Y. 2004) .......... 16

*NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*,
922 A.2d 417 (Del. Ch. 2007) .......... 16

*Nicosia v. Amazon.com, Inc.*,
384 F. Supp. 3d 254 (E.D.N.Y. 2019) .......... 16

*Oberstein v. Live Nation Ent., Inc.*,
60 F.4th 505 (9th Cir. 2023) ........ 12, 13

*Rent-A-Center, West, Inc. v. Jackson*,
561 U.S. 63 (2010) ........ 20

*Rodarte v. Betterhelp, Inc.*,
No. 24-cv-07154-NW (N.D. Cal. July 14, 2025) ........ 20, 21

*RUAG Ammotec GmbH v. Archon Firearms, Inc.*,
139 Nev. 465 (2023) ........ 14, 16, 18

*S.G. v. Epic Games, Inc.*,
2025 WL 2447456 (N.D. Cal. Aug. 26, 2025) ........ 15, 19

*Simple Traditions, Inc. v. Paychex, Inc.*,
2024 WL 4957225 (E.D. Cal. Dec. 3, 2024) ........ 16

*Smith v. Spizzirri*,
601 U.S. 472 (2024) ........ 12

*Wilcox & Fetzer, Ltd. v. Corbett & Wilcox*,
2006 WL 2473665 (Del. Ch. Aug. 22, 2006) ........ 18

*Yeh v. Tesla, Inc.*,
2023 WL 6795414 (N.D. Cal. Oct. 12, 2023) ........ 15, 17, 18, 19

**STATUTES**

9 U.S.C. § 4 ........ 2, 11

**OTHER AUTHORITIES**

AAA Consumer Arbitration Rules and Mediation Procedures, Rule 7 ........ 10

**<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

## I. INTRODUCTION

Enforcement of arbitration agreements matters because it ensures that disputes are resolved in the forum the parties choose. This motion presents a straightforward application of that principle. When parents agree to arbitrate disputes related to products and services they bring into their home and for their children's benefit, claims brought by their children arising from those products and services must be resolved through arbitration as the parents agreed.

Plaintiffs allege that they are children who watched TV by accessing Roku streaming sticks and Roku TVs. Those streaming devices can be activated only after someone creates a Roku account, just as Plaintiffs' parents did. That is important because when they created their accounts, the parents agreed to Roku's terms, including an agreement to arbitrate all disputes related to their accounts and to the devices and services accessed through their accounts. Plaintiffs now seek to litigate claims that exist solely because they accessed their parents' Roku accounts. Their position—that they may enjoy the benefits of their parents' accounts while avoiding their corresponding obligations—contradicts both settled law and established principles of fairness and equity.

Courts have long recognized that non-signatories to arbitration agreements, like Plaintiffs, are required to arbitrate when any of three independent equitable-estoppel doctrines applies: (1) a preexisting relationship exists between the signatory and non-signatory, (2) the non-signatory directly benefits from the agreement, or (3) the claims are intertwined with the agreement's terms. Each doctrine independently applies here. Plaintiffs accessed Roku's services through their parents' accounts, enjoyed the services and content made possible by those accounts, and now seek to assert claims that presuppose and depend on their existence.

Equity and fairness require Plaintiffs to honor their parents' choice to arbitrate. So too does the Federal Arbitration Act. The FAA codifies a "national policy" to enforce arbitration agreements "according to their terms so as to facilitate streamlined proceedings." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344, 346 (2011). That mandate reflects a basic fairness: contractual benefits and burdens must be equally enforced. Allowing Plaintiffs to proceed in court

would invite mischief and reward artful pleading that undermines the predictability and certainty that modern commerce demands. Equity, fairness, and the FAA foreclose that result.

Accordingly, this Court should enforce the arbitration agreements and grant Roku's motion to compel.

## II. STATEMENT OF ISSUE TO BE DECIDED

Whether the Court should compel Plaintiffs to arbitrate their claims.

## III. BACKGROUND

### A. Roku accountholders agree to mandatory arbitration.

Roku streaming sticks and Roku TVs are Internet-connected devices. Declaration of Julian Riediger in Support of Roku Motion to Compel Arbitration ("Riediger Decl.") ¶ 2. A Roku account is necessary to activate and use the streaming functionality of these devices. *Id.*

For more than a decade, Roku has required individuals creating a Roku account to check a box confirming they agree to Roku's terms. *Id.* ¶ 3. Today, for example, the account-creation webpage notifies individuals that Roku's terms apply, requiring them to affirmatively check a box stating, "I agree to the Terms and Conditions. I have read the Privacy Policy and California Privacy Notice." *Id.* ¶ 4, Ex. A. The terms are accessible via a visually distinct blue, underlined hyperlink adjacent to the checkbox, allowing individuals to review the full terms before proceeding. *Id.*

An individual cannot create a Roku account without checking the box and agreeing to the terms. If they attempt to continue without checking the box, an error message would appear, like the one shown below: "To create a Roku account, you must agree to the Roku Terms and Conditions." *Id.* ¶ 5, Ex. B.




Notably, if they do accept the Roku terms, they necessarily agree to a mandatory arbitration

provision with a class-action waiver. *Id.* ¶ 7, Ex. D at § 1.E; *id.* ¶ 8, Ex. E at 1; *id.* ¶ 9, Ex. F at 5. Over the last decade, Roku's arbitration provision has specified that claims arising out of or relating to any Roku account, Roku products and services, and any use thereof must be resolved exclusively through arbitration and that disputes can only be brought on an individual basis, not in a class action.[1] *Id.* And throughout this span, the terms have delegated to the arbitrator authority to decide all issues of arbitrability. *Id.*

Roku's Dispute Resolution Terms were most recently updated in February 2024. To continue using the streaming functionality of Roku devices, accountholders were required to affirmatively assent to the updated terms. *Id.* ¶¶ 10–11, Ex. G.




Roku also notified accountholders of this update via email. *Id.* ¶¶ 12–13, Ex. H.




[1] The only claims not subject to arbitration are not at issue here: intellectual-property claims, claims brought in small-claims court, and claims seeking a temporary restraining order.

The 2024 Dispute Resolution Terms make clear: "READ THESE DISPUTE RESOLUTION TERMS CAREFULLY." *Id.* ¶ 7, Ex. D at § 1. They re-confirm that the requirement to arbitrate applies to a broad set of claims:

> any dispute, claim, cause of action, or controversy between you and Roku, whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory, that arises from or relates to your Roku account, any of our products, software, or services (including any devices linked to your Roku account, whether or not owned by you), any advertising or promotions conducted by or for Roku, or any use or disclosure of your information or information about you, or claims related to the arbitrability, validity, enforceability, or scope of any Roku consumer terms and conditions between you and Roku (including these Dispute Resolution Terms) or any portion of them.

*Id.* ¶ 7, Ex. D at § 1.A.

The 2024 Dispute Resolution Terms incorporate the American Arbitration Association's Consumer Arbitration Rules and provide that "the arbitrator will have exclusive authority to make all procedural and substantive decisions regarding any Claim in arbitration and to grant any remedy or relief that would be available in a court under law or in equity." *Id.* ¶ 7, Ex. D at § 1.E. The AAA's Consumer Arbitration Rules similarly provide that "[t]he arbitrator shall have the power to rule on their own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement or the arbitrability of any claim or counterclaim."[2] AAA Consumer Arbitration Rules, R-7(a).

Individuals who do not prefer to arbitrate may decline to create an account or accept the terms and opt out of arbitration in writing within 30 days of first agreeing to the Dispute Resolution Terms. *Id.* ¶ 7, Ex. D at § 1.L.

**B. Plaintiffs used their parents' Roku accounts to access Roku devices and services.**

Plaintiffs allege that they are children who bring this action through their parents. Compl. ¶ 12. Plaintiffs admit they used Roku devices, such as Roku streaming sticks and Roku-enabled

---

[2] American Arbitration Association, Consumer Arbitration Rules and Mediation Procedures, https://www.adr.org/media/yawntdvs/2025_consumer_arbitration_rules.pdf (May 1, 2025).

TVs in their households, to "view[] and interact[] with child-directed content on Roku's platforms." *See id.* ¶¶ 206–07, 215–16, 224–25, 233–34, 242–43, 251–52. Plaintiffs' parents, through whom they bring this lawsuit, agreed to arbitrate on an individual basis any claim arising out of or relating to their Roku accounts and devices. Roku's records do not include any opt-out request submitted for Plaintiffs' parents. Riediger Decl. ¶ 14.

### C. Plaintiffs filed a putative class action in court.

Despite the arbitration clause governing all use of their Roku devices, Plaintiffs filed this judicial action on behalf of a putative nationwide class and four state subclasses in California, Illinois, Nevada, and New Jersey. Compl. ¶¶ 266–71. The gist of Plaintiffs' allegations is that Roku supposedly collected their personal information "to track, profile, and target" them while using the Roku streaming devices their parents set up. *Id.* ¶¶ 210, 219, 228, 237, 242, 246, 255. Based on those allegations, they assert violations of the Video Privacy Protection Act ("VPPA") and Children's Online Privacy and Protection Act ("COPPA"), along with other state and common-law privacy claims. *Id.* ¶¶ 18–23, 281–455. To save the Court and the parties time and expense, the Court granted Roku's administrative motion to sequence the initial briefing to allow the parties and the Court to first address whether arbitration is required before they address other non-arbitration issues, if necessary. ECF Nos. 35, 39.

## IV. LEGAL STANDARD

Roku moves to compel arbitration under Section 4 of the Federal Arbitration Act ("FAA"). 9 U.S.C. § 4. The FAA embodies a "national policy favoring arbitration," and courts are directed to enforce arbitration agreements "according to their terms so as to facilitate streamlined proceedings." *AT&T Mobility*, 563 U.S. at 344, 346; *see also Droesch v. Wells Fargo Bank, N.A.*, 2021 WL 1817057, at *2 (N.D. Cal. May 6, 2021) ("The FAA espouses a general policy favoring arbitration agreements.").

On a motion to compel arbitration, the court's inquiry is limited to two threshold questions: "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). But if the court determines that a valid agreement to arbitrate exists and the

parties delegated to the arbitrator resolution of the second condition (i.e., scope), as is the case here, then the court may not decide whether the agreement encompasses the dispute at issue and must compel arbitration. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019) ("But if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue."); *Smith v. Spizzirri*, 601 U.S. 472, 476–78 (2024) (requiring stay of court action if arbitration is compelled).

## V. ARGUMENT

### A. Valid agreements to arbitrate exist.

#### 1. Courts routinely enforce clickwrap agreements like Roku's.

Courts routinely enforce "clickwrap" agreements—like Roku's terms—when "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515 (9th Cir. 2023). And courts consistently find a binding clickwrap contract where, as here, the terms are hyperlinked, clearly labeled, and acceptance is required to proceed. *See, e.g.*, *Ferguson v. Age of Learning, Inc.*, 2021 WL 4735736, at *5 (C.D. Cal. July 23, 2021) ("The first type of Internet agreement, clickwrap, clearly forms a valid contract. In a clickwrap agreement, the user affirmatively checks a box agreeing to the terms and conditions.").

Delaware law applies to this transaction because Roku's current dispute-resolution terms call for the application of Delaware law. Riediger Decl. ¶ 7, Ex. D at § 3. The enforceability of Roku's terms under that state's law is not a close question: "Clickwrap agreements are routinely recognized by courts and are enforceable under Delaware law." *Geraci v. Uber Techs., Inc.*, 2021 WL 5028368, at *2 (Del. Super. Ct. Oct. 29, 2021), *aff'd*, 279 A.3d 356 (Del. 2022).

Nor would it be a close question elsewhere. After all, courts in California, Illinois, Nevada, and New Jersey—Plaintiffs' alleged states of residence and citizenship—uniformly recognize the enforceability of clickwrap agreements. *See, e.g.*, *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855–56 (9th Cir. 2022) (applying California law and holding that "courts have routinely found clickwrap agreements enforceable"); *Hopkins v. Dell Techs., Inc.*, 2023 WL 3791722, at *4 (S.D.

Ill. June 2, 2023) ("Illinois and Texas law recognize the validity and enforceability of so called 'clickwrap agreements,' those online agreements accepted by clicking a button to manifest acceptance."); *Broadnax v. Uber Techs., Inc.*, 790 F. Supp. 3d 996, 1004 (D. Nev. 2025) (applying Nevada law and holding that "[t]he most straightforward application of these principles in the online world involves so-called 'clickwrap' agreements, in which a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed. Courts have routinely found clickwrap agreements enforceable" (cleaned up)); *Erasmus v. LegalZoom.com, Inc.*, 2025 WL 1122237, at *5 (D.N.J. Apr. 15, 2025) ("Consumer web-based contracts are no longer a novel concept. Indeed, New Jersey courts have recognized the validity of such contracts for decades. Contracts that require that a user consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with the internet transaction are sometimes called 'clickwrap' agreements. Such agreements are routinely enforced by the courts." (citations omitted)).

**2. Plaintiffs' parents agreed to arbitrate disputes with Roku.**

Plaintiffs' parents created Roku accounts and affirmatively agreed to Roku's terms, which require arbitration of all disputes. During the account-creation process, the parents received conspicuous notice of and access to the terms via a blue hyperlink, allowing them to review the full text. *See* Riediger Decl. ¶ 4, Ex. A. They then affirmatively checked the box stating, "I agree to the Terms and Conditions." *Id.* They could not have created their accounts and used Roku devices and streaming services without checking the box confirming their agreements. *Id.* ¶ 5, Ex. B. This meets both requirements for an enforceable clickwrap agreement: (1) reasonably conspicuous notice of the terms, and (2) an unambiguous manifestation of assent. *See Oberstein*, 60 F.4th at 515.

Plaintiffs' parents also had multiple opportunities to decline arbitration: they could have declined to create Roku accounts, or they could have opted out of arbitration within 30 days while continuing to use Roku products and services. Riediger Decl. ¶ 7, Ex. D at § 1.L. They did neither. *Id.* ¶ 14. Plaintiffs' parents therefore agreed to arbitrate disputes arising out of or relating to their Roku accounts and devices.

**B. Well-established equitable doctrines require Plaintiffs to arbitrate.**

Plaintiffs' claims arise solely from their use of Roku devices and services through their parents' Roku accounts, which are governed by Roku's terms and arbitration requirement. So even though Plaintiffs themselves may not have checked the box agreeing to Roku's terms, under well-established equitable doctrines, non-signatories like Plaintiffs must arbitrate their claims when any of the following is true: (1) a preexisting relationship exists between the signatory and non-signatory, (2) the non-signatory directly benefited from the agreement, or (3) the claims are intertwined with the agreement's benefits and obligations.

Each of these independent doctrines requires arbitration here. *See, e.g.*, *Ishimaru v. Fung*, 2005 WL 2899680, at *18 n.47 (Del. Ch. Oct. 26, 2005) ("The various legal and equitable principles (e.g., agency, veil piercing, equitable estoppel, assumption by conduct) that can be deployed to require a signatory to arbitrate with a non-signatory can also be used to require a non-signatory to arbitrate with a signatory."); *Gurler v. Westpac Surgical, LLC*, 2020 WL 10317436, at *2 (C.D. Cal. Dec. 11, 2020) (explaining that a "nonsignatory may be compelled to arbitrate under principles of equitable estoppel."); *Elsasser v. DV Trading, LLC*, 444 F. Supp. 3d 916, 928 (N.D. Ill. 2020) ("The parties apply Illinois law here. . . . Estoppel is an equitable doctrine that prevents a non-signatory from refusing to comply with an arbitration clause when it receives a direct benefit from a contract containing an arbitration clause." (cleaned up)); *RUAG Ammotec GmbH v. Archon Firearms, Inc.,* 139 Nev. 465, 471 (2023) ("[U]nder established Nevada caselaw, a nonsignatory to an arbitration agreement can be obligated to arbitrate if one of the five theories [incorporation by reference, assumption, agency, veil-piercing/alter ego, and estoppel] is satisfied."); *Haskins v. First Am. Title Ins. Co.*, 866 F. Supp. 2d 343, 348 (D.N.J. 2012) ("Under New Jersey law, a non-signatory may be bound to an arbitration agreement under one of several theories: (1) incorporation by reference, (2) assumption, (3) agency, (4) third-party beneficiary, (5) veil-piercing/alter ego, and (6) waiver and estoppel.")

**1. Preexisting-relationship estoppel: Plaintiffs have a preexisting relationship with their parents, the Roku accountholders.**

Courts routinely hold that non-signatories are bound to arbitrate when a "preexisting

relationship exist[s] between the nonsignatory and one of the parties to the arbitration agreement." *Chan v. Charter Commc'ns Holding Co.*, 2015 WL 12655701, at *5 (C.D. Cal. Aug. 6, 2015). Such a relationship makes it "equitable to compel the nonsignatory to also be bound to arbitrate his or her claim." *Crowley Mar. Corp. v. Bos. Old Colony Ins. Co.*, 158 Cal. App. 4th 1061, 1070 (2008). "Examples of the preexisting relationship include agency, spousal relationship, parent-child relationship and the relationship of a general partner to a limited partnership." *Id.* "Thus an arbitration clause often applies to the spouse and children of the signatory." *Chan*, 2015 WL 12655701, at *5.

Courts have consistently recognized the parent-child relationship as a paradigmatic example of a preexisting relationship that requires arbitration. In *S.G. v. Epic Games, Inc.*, 2025 WL 2447456, at *5 (N.D. Cal. Aug. 26, 2025), the court compelled arbitration of a non-signatory minor's claims arising from the use of his father's account to play the video game Fortnite. The father consented to the license agreement and arbitration provision "for both of their benefit on the shared account," and the father was "facilitating" the child's gameplay. *Id.* The court concluded that the "preexisting relationship between S.G. and his father makes it 'equitable' to impose the duty to arbitrate upon S.G. even if he did not sign the EULA himself." *Id.* The court emphasized that refusing to compel arbitration under these circumstances would allow individuals to "avoid contractual obligations governing the use of online accounts simply by having third parties create accounts and then using them as the Plaintiff did, even when the third parties maintained the accounts with the knowledge and expectation that the plaintiff would use them." *Id.* (cleaned up).

Similarly, in *Yeh v. Tesla, Inc.*, 2023 WL 6795414, at *1 (N.D. Cal. Oct. 12, 2023), the court compelled arbitration of privacy claims brought by a one-year-old child whose father purchased a Tesla vehicle subject to an arbitration provision. The court concluded that the father's agreement to arbitrate extended to his son's claims as well, even though his son did not independently agree to arbitrate, because the "parent-child relationship is one such relationship" that "mak[es] it equitable to compel the nonsignatory to also be bound to arbitrate his or her claim." *Id.* at *7–8.

Other courts have applied the same principles to compel arbitration because of preexisting

family and household relationships. In *Motise v. America Online, Inc.*, a child was bound by his stepfather's agreement because he accessed AOL's services solely through the stepfather's account. 346 F. Supp. 2d 563, 566 (S.D.N.Y. 2004). In *Chan*, both a spouse and children were bound to arbitrate under the husband/father's agreement. 2015 WL 12655701, at *5. And in *Nicosia v. Amazon.com, Inc.*, a plaintiff who purchased through his wife's Amazon account was bound by the arbitration provision under equitable estoppel. 384 F. Supp. 3d 254, 258–59, 272 (E.D.N.Y. 2019), *aff'd*, 815 F. App'x 612 (2d Cir. 2020).

So too here. Plaintiffs used Roku devices and the streaming functionality of those devices through their parents' accounts, and Roku's terms apply to "anyone in your household that uses your account" and to all claims "arising out of or relating to your Roku account." Riediger Decl. ¶ 6, Ex. C at 1, 5. In this context, the preexisting relationship between Plaintiffs and their parents makes it "equitable" to require Plaintiffs to arbitrate their claims.

**2. Direct-benefits estoppel: Plaintiffs received direct benefits by using their parents' accounts.**

Equitable estoppel also requires Plaintiffs to arbitrate their claims because they directly benefited from their parents' Roku accounts.

Courts routinely apply the doctrine of "direct benefits estoppel" to prevent a non-signatory from receiving the benefits of a contract while seeking to avoid its obligations, including an arbitration requirement. *Corn v. Kohl's Corp.*, 2025 WL 1785943, at *1–2 (N.D. Cal. June 9, 2025); *see also Simple Traditions, Inc. v. Paychex, Inc.*, 2024 WL 4957225, at *6 (E.D. Cal. Dec. 3, 2024) ("The Ninth Circuit has repeatedly expressed that equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." (cleaned up)); *NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 431 (Del. Ch. 2007) ("Where a contract contains an arbitration clause which is legally enforceable, the general rule is that the beneficiary is bound thereby to the same extent that one of the signatories is bound." (cleaned up)); *RUAG*, 139 Nev. at 472 ("[A] nonsignatory is estopped from refusing to comply with an arbitration clause when it receives a direct benefit from a contract containing an arbitration clause."); *Facta Health, Inc. v. Pharmadent, LLC*, 2020 WL 5957619, at

*3 (D.N.J. Oct. 8, 2020) (compelling arbitration because "the non-signatory has otherwise embraced the agreement and has obtained, or has sought to obtain, benefits flowing from it" (citing *Hirsch v. Amper Fin. Servs., LLC*, 71 A.3d 849, 860 (N.J. 2013))); *Elsasser*, 444 F. Supp. 3d at 928 (compelling arbitration under Illinois law because the non-signatory plaintiffs sought to "benefit directly from the operating agreement").

For example, in *Corn*, the non-signatory plaintiff was bound by her husband's arbitration agreement after she used his account to obtain rewards points, thereby receiving direct benefits from the contract. 2025 WL 1785943, at *1. In *Atencio v. Bird Rides Inc.*, a non-signatory mother was compelled to arbitrate personal-injury claims arising from her use of a scooter rented through her son's account because "[i]f it were not for Plaintiff's son entering into the agreement, the scooter could not have been unlocked or used." 2023 WL 8168955, at *1–2 (C.D. Cal. Nov. 3, 2023). Similarly, in *Hofer v. Emley*, a non-signatory passenger was required to arbitrate claims with a car-rental company because the passenger "knowingly received benefits flowing directly from the Agreement" and was a passenger in the car that his brother rented so they "*both* . . . could travel to visit family." 2019 WL 4575389, at *5–8 (N.D. Cal. Sept. 20, 2019) (emphasis in original). And in *Tesla*, the court compelled arbitration of the non-signatory child's claim because the signatory father purchased the vehicle intending that his child would benefit from the vehicle: "Yeh's purchase was, at least in part, to benefit and provide care for his child." 2023 WL 6795414, at *8.

The same principle applies here. Plaintiffs' claims arise solely because they received benefits from their parents' Roku accounts and agreements—specifically, access to Roku devices, streaming content, and features such as voice-enabled controls. These are the core benefits conferred by a Roku account: "Your Roku account gives you access to certain device features and functionality, as well as access to streaming content from various content providers." Riediger Decl. ¶ 6, Ex. C at 1. Absent these benefits, Plaintiffs would have no basis for their claims.

Plaintiffs must therefore arbitrate their claims under the terms of the agreements from which they benefited.

**3. Intertwined-claims estoppel: Plaintiffs' claims are intertwined with their parents' agreements with Roku.**

Plaintiffs are also required to arbitrate because their claims are intertwined with their parents' agreements with Roku. Courts routinely compel non-signatories to arbitrate when their claims are "intertwined with the underlying contractual obligations." *Montoya v. Comcast Corp.*, 2016 WL 5340651, at *5 (E.D. Cal. Sept. 23, 2016); *see also Tesla*, 2023 WL 6795414, at *8 (compelling arbitration where minor's claims were "closely intertwined with the claims his father agreed to arbitrate"); *Wilcox & Fetzer, Ltd. v. Corbett & Wilcox*, 2006 WL 2473665, at *5 (Del. Ch. Aug. 22, 2006) (compelling arbitration of non-signatory plaintiff's claims that were "intertwined with" the contract); *KPH Healthcare Servs., Inc. v. Janssen Biotech, Inc.*, 2021 WL 4739601, at *8 (D.N.J. Oct. 12, 2021) (compelling arbitration where the claims were "fully intertwined"); *RUAG*, 139 Nev. at 473 (adopting intertwined-claims theory of estoppel). A claim is considered "intertwined" when it relies on, or presumes the existence of, the contract's benefits or obligations. *Montoya*, 2016 WL 5340651, at *5.

Here, Plaintiffs' claims are inseparable from their parents' contractual relationships with Roku. Plaintiffs allege that their personal information was collected and disclosed while using Roku devices—activities that were possible only through their parents' Roku accounts and their agreements with Roku. Compl. ¶¶ 48–49. Plaintiffs could not have accessed Roku's devices or services without their parents' agreements to Roku's terms, which expressly require arbitration of all related disputes.

The reasoning in *Montoya* is spot on. There, the plaintiffs (non-signatory household members) used cable and internet services provided under another household member's service agreement with Comcast and alleged improper data collection. 2016 WL 5340651, at *1. The court compelled arbitration, holding that the plaintiffs' claims were "intertwined with the [Comcast] contract because they [were] seeking to enforce the benefits of the contract (cable/internet services and protection of personal information) while simultaneously seeking to avoid the obligations of the contract (arbitration of disputes)." *Id.* at *6.

That is precisely what Plaintiffs here are doing. Their claims arise from their use of Roku

devices and streaming services, which are governed by the terms and arbitration requirement. Their claims cannot be separated from the contractual framework established by their parents' agreements with Roku.

**C. Equity and the FAA's policy compel the same result.**

The FAA's core purpose is to ensure "the enforcement of private agreements according to their terms." *AT&T Mobility LLC*, 563 U.S. at 344. Each equitable estoppel doctrine—preexisting relationship, direct benefits, and intertwined claims—serves that same purpose: preventing parties from unfairly accepting contractual benefits while avoiding the agreed arbitration forum for disputes.

Permitting individuals to sidestep arbitration simply by using another household member's account would undermine both the FAA's purpose and the foundation of modern online commerce. Businesses rely on predictable, enforceable user agreements to govern account-based access and dispute resolution. Declining to enforce arbitration agreements against non-signatory users who benefit from a signatory's account would create a loophole for avoiding contractual obligations, incentivize account sharing to evade terms, and frustrate the intent of these agreements. Non-enforcement would expose businesses to unpredictable litigation risks, reduce efficiency, and erode consumer protections and expectations. The integrity of contractual relationships depends on courts enforcing agreements according to their terms and the parties' reasonable expectations. *See, e.g.*, *Epic Games*, 2025 WL 2447456, at *5; *Tesla*, 2023 WL 6795414, at *8. Principles of equity therefore require Plaintiffs' claims to be submitted to arbitration, consistent with the FAA's overarching goal of ensuring fairness, predictability, and respect for the parties' chosen forum.

**D. Arbitrability is delegated to the arbitrator.**

Because there are valid agreements to arbitrate, the only remaining question is "whether the agreement encompasses the dispute at issue." *Chiron Corp.*, 207 F.3d 1130. However, because the arbitration agreements delegate resolution of that issue to the arbitrator, there is nothing more for the Court to address. *See Henry Schein*, 586 U.S. at 69 ("[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the

arbitrability issue.”).

**1. The terms delegate arbitrability to the arbitrator.**

Parties may delegate arbitrability in two ways: (1) by including an express delegation clause or (2) by incorporating the rules of an arbitral body that assign such authority to the arbitrator. *See Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1029 (9th Cir. 2022) (express delegation); *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (incorporation of arbitration rules). For over a decade, Roku’s terms, through express delegation language and/or incorporation of arbitrator rules, have delegated to the arbitrator authority to decide all issues of arbitrability.

First, Roku’s current terms expressly provide that “the arbitrator will have exclusive authority to make all procedural and substantive decisions regarding any Claim in arbitration and to grant any remedy or relief that would be available in a court under law or in equity.” Riediger Decl. ¶ 7, Ex. D at § 1.E; *see also id.* ¶ 8, Ex. E at 1 (2020 terms). This language “clearly and unmistakably” delegates arbitrability issues—including enforceability and scope—to the arbitrator. *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68 (2010) (finding clear and unmistakable intent to delegate question of arbitrability where contract provided the arbitrator with “exclusive authority” to resolve any dispute relating to the arbitration agreement); *Rodarte v. Betterhelp, Inc.*, No. 24-cv-07154-NW, ECF No. 44 at 6–7 (N.D. Cal. July 14, 2025) (Wise, J.) (same).

Second, Roku’s arbitration terms have always incorporated rules that grant the power to decide arbitrability to the arbitrator. For example, the current terms incorporate the AAA Consumer Arbitration Rules, which expressly empower the arbitrator to decide issues of arbitrability: “[T]he rules applicable to Claims between you and Roku (the ‘Applicable Rules’) are the then-current version of the AAA’s Consumer Arbitration Rules, as modified by these Dispute Resolution Terms.” Riediger Decl. ¶ 7, Ex. D at § 1.E; *see also id.* ¶ 8, Ex. E at 1 (2020 terms); *id.* ¶ 9, Ex. F at 5 (2015 terms). Rule 7 of the AAA’s Consumer Arbitration Rules provides that “[t]he arbitrator shall have the power to rule on their own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement or the arbitrability of any

claim or counterclaim." AAA Consumer Arbitration Rules, R-7(a). The Ninth Circuit and this Court hold that such "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Brennan*, 796 F.3d at 1130; *Rodarte*, No. 24-cv-07154-NW, ECF No. 44 at 6–7 (Wise, J.) (same).

Because the terms—through express delegation language and/or incorporation of arbitrator rules—delegate arbitrability questions to the arbitrator, the Court "possesses no power to decide the arbitrability issue" and is required to compel arbitration. *Henry Schein*, 586 U.S. at 68.

**2. Even if the terms did not delegate arbitrability, Plaintiffs' claims fall squarely within the agreements.**

Even if the Court were to determine that the terms did not delegate arbitrability questions to the arbitrator, the Court should conclude that Plaintiffs' claims fall squarely within their arbitration agreements. The Ninth Circuit has long held that to require arbitration, a plaintiff's factual allegations need only "touch matters" covered by the contract containing the arbitration clause. *Charles v. Portfolio Recovery Assocs., LLC*, 2024 WL 1672350, at *2 (9th Cir. Apr. 18, 2024); *Chan*, 2015 WL 12655701, at *3.

Plaintiffs' claims plainly "touch matters" covered by the broad arbitration provision. The current terms require arbitration of all "Claims," defined to include "any dispute, claim, cause of action, or controversy between you and Roku, whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory, that arises from or relates to your Roku account, any of our products, software, or services (including any devices linked to your Roku account, whether or not owned by you), any advertising or promotions conducted by or for Roku, or any use or disclosure of your information or information about you." Riediger Decl. ¶ 7, Ex. D at § 1.A; *id.* ¶ 8, Ex. E at 1; *id.* ¶ 9, Ex. F at 4.

Plaintiffs allege that Roku "systematically collected, used, and disclosed to third-parties [Plaintiffs'] Personal Information" when they watched content and advertisements on Roku's streaming devices. Compl. ¶¶ 8, 206–59. These privacy claims directly "arise from or relate to" their use of Roku devices and services and thus fall within the arbitration clause's express coverage of claims relating to the "use or disclosure of your information or information about you." Riediger

Decl. ¶ 7, Ex. D at § 1.A.

* * *

In sum, Plaintiffs' claims are inseparable from their use of Roku's devices and services through their parents' accounts, which are bound by clear, enforceable arbitration terms. The Federal Arbitration Act and bedrock principles of equity require the same thing: those who take the benefits of an agreement must take its dispute-resolution terms too. To hold otherwise would undermine the predictability that arbitration promises and reward the kind of artful pleading courts have long rejected. Accordingly, the Court should compel arbitration and stay this action.[3]

## VI. CONCLUSION

For the foregoing reasons, Roku respectfully requests that the Court compel arbitration and stay this action.

Dated: December 9, 2025

**PERKINS COIE LLP**

By: *s/ Eric J. Weiss*

Eric J. Weiss, *pro hac vice*
Mallory A. Gitt, *pro hac vice*
Gillian C. Kuhlmann, Bar No. 316241
Lauren Trambley, Bar No. 340634

Attorneys for Defendant Roku, Inc.

[3] Consistent with Ninth Circuit authority, and out of an abundance of caution, if the Court does not grant Roku's motion to compel arbitration, Roku requests leave to conduct limited discovery to address arbitration. *See Knapke v. PeopleConnect, Inc.*, 38 F.4th 824, 833 (9th Cir. 2022) ("Here, PeopleConnect conditionally, and sufficiently, requested discovery in its motion to compel [arbitration]. Nothing required PeopleConnect to seek discovery first, and the district court never found (nor could it have) that PeopleConnect waived taking discovery. . . . [W]e have confirmed that the FAA's procedure mirrors the three phases of federal civil lawsuits: a motion to compel arbitration akin to a motion to dismiss; followed by optional discovery before summary judgment, if the motion is denied; followed by a mini-trial, if necessary.").